# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00453-CV

---

**C. O., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 308287-B, THE HONORABLE ALAN MAYFIELD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

C.O. (Mother) appeals the trial court's final decree appointing the Texas Department of Family and Protective Services as permanent managing conservator of her three sons—N.B., born in 2016; A.B., born in 2018; and M.S.J., born in 2019.[1]  In one issue on appeal, Mother asserts that the trial court abused its discretion because the Department failed to present sufficient evidence to overcome the statutory presumption that she should be appointed as the children's sole managing conservator.  *See* Tex. Fam. Code § 263.404(a).  We conclude that the evidence is factually insufficient to support the trial court's finding that appointment of Mother as the children's managing conservator would significantly impair the children's physical health and emotional development.  We reverse that portion of the trial court's decree appointing the Department as permanent managing conservator and remand the case to the trial court for a new trial on the issue of conservatorship.

---

[1]  For the children's privacy, we refer to C.O. as "Mother" and to the children and others involved by their initials.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

## CONSERVATORSHIP AND THE PARENTAL PRESUMPTION

The primary consideration in determining conservatorship is always the child's best interest. *Id.* § 153.002; *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting out nonexhaustive list of factors to determine child's best interest). The parent-child relationship, however, is constitutionally protected, s*ee In re C.J.C.*, 603 S.W.3d 804, 807 (Tex. 2020) (citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) (recognizing that parents have fundamental right to make decisions concerning care, custody, and control of their children), and "deeply embedded in Texas law" is a presumption that it is in the child's best interest to award custody to a parent, *see id. at* 812 (quoting *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000)); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (noting that "there is a strong presumption that the best interest of a child is served by keeping the child with a parent").

Although trial courts generally have broad discretion in determining what is in a child's best interest, *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982), the "legislature has explicitly limited the exercise of that discretion when a nonparent seeks to be appointed as managing conservator," *In re F.E.N.*, 542 S.W.3d 752, 769 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990)); *R.H. v. D.A.*, No. 03-16-00442-CV, 2017 Tex. App. LEXIS 1743, at *9 (Tex. App.—Austin Mar. 2, 2017, pet. dism'd) (mem. op.). Under Section 153.131 of the Texas Family Code, when a trial court determines conservatorship between a parent and a nonparent, a presumption exists that appointing the parent as sole managing conservator or both parents as managing conservators is in the child's best interest. Tex. Fam. Code § 153.131(b). Generally, to overcome this parental presumption, the nonparent must prove by a preponderance of the evidence that "appointment of the parent or parents would not be in the best interest of the child because the appointment would

2

significantly impair the child's physical or emotional development." *Id.* § 153.131(a); *see id.* § 105.005 ("Except as otherwise provided by this title [governing suits affecting the parent-child relationship], court findings shall be based on a preponderance of the evidence."); *see also id.* §§ 153.004(b) (limiting presumption in cases where parent commits physical or domestic abuse), .131(b) ("A finding of a history of family violence involving the parents of a child removes the presumption under this subsection."), .373 (voluntary surrender of possession rebuts parental presumption).

Applicable here, Section 263.404 governs a trial court's decision to appoint the Department as the child's managing conservator without terminating parental rights. *Id.* § 263.404; *see id.* § 161.205 (providing that if trial court does not order termination of parental rights, it shall either deny the petition or "render any order in the best interest of the child"). Under this provision, which incorporates the parental presumption found in Section 153.131, a trial court may appoint the Department as managing conservator without terminating parental rights if it finds that:

> (1) a parent's appointment as managing conservator would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development; and
>
> (2) it would not be in the best interest of the child to appoint a relative of the child or another person as managing conservator.

*Id.* § 263.404(a). In deciding whether to appoint the Department as managing conservator without terminating parental rights, the court must consider the child's needs and desires and

3

whether the child has special medical or behavioral needs that make adoption of the child unlikely.[2] *Id.* § 263.404(b).

## BACKGROUND

In March 2019, the Department began an investigation after receiving a report of neglectful supervision of N.B. and A.B. by Mother and her live-in boyfriend, M.J.[3] According to the report, there was domestic violence in the home, M.J. was often intoxicated or high on marijuana or Xanax, and the children were scared of M.J. The next month, Department investigator Nacole Wyche spoke with a detective with the Killeen Police Department, who informed her that police had recently responded to an altercation at the home. As a result of that altercation, N.B. sustained a head injury, and an emergency protective order was issued against M.J.

According to the removal affidavit, made part of the record at the final hearing, Wyche then met with Mother at the family's home. During the visit, Wyche discovered that although M.J. had been arrested for assaulting N.B. and was subject to a protective order, Mother had allowed M.J. to return to the home. Mother also told Wyche that N.B. was injured as a result of hitting his head on a table when M.J. grabbed him and that she was trying to get the "protective order dropped because [M.J.] did not mean to hurt [N.B.]." During the visit, Wyche observed that Mother was unable to pick A.B. up from the floor. Mother explained that she suffers from muscle degeneration and that, as a result, she has difficulty caring for the

---

[2] Although not relevant here, subsection (b) of Section 263.404 also requires the trial court to consider whether the child will reach eighteen years of age in not less than three years and whether a child twelve years of age or older has expressed a strong desire against termination or being adopted. *See* Tex. Fam. Code § 263.404(b).

[3] N.B.'s and A.B.'s biological father died in 2017. M.J. is M.S.J.'s biological father.

children and relies on M.J. for help. In addition, Mother reported that she suffers from anxiety, depression, and post-traumatic stress disorder but had stopped going to therapy and was not taking her medication. Wyche then found A.B. in the bedroom closet, on a "tummy time" toy, with the door shut and the lights off. He smelled of feces and had a mild diaper rash, and there were no diapers or wipes in the home. Wyche also observed marijuana "roaches" and paraphernalia in the open and accessible to the children, and Mother stated that the home smelled of marijuana due to M.J. smoking marijuana in the home.

On April 3, 2019, the Department filed an original petition seeking conservatorship and termination of Mother's parental rights to N.B. and A.B. The next month, Mother gave birth to M.S.J., and the Department filed an amended petition to terminate Mother's and M.J.'s parental rights to M.S.J. and to obtain conservatorship of M.S.J. Following show-cause hearings, the children were removed from Mother's and M.J.'s care, the Department was named temporary managing conservator of the children, and Mother and M.J. were placed on family-service plans.

A final hearing commenced on November 9, 2020, and reconvened on February 8, May 10, and July 12, 2021.[4] After conclusion of the July 2021 hearing, the trial

---

[4] The statutory automatic-dismissal deadline for the trial court to commence trial or grant an extension in this case was April 6, 2020, and the case was set for a final hearing on March 16, 2020. *See* Tex. Fam. Code § 263.401 (providing for automatic dismissal of suit filed by Department that requests termination or conservatorship unless court has commenced trial on merits or granted extension "on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator"). Due to COVID-19, the trial court extended the dismissal deadline and reset the hearing to November 9, 2020. *See First Emergency Order Regarding the COVID-19 State of Disaster*, 596 S.W.3d 265 (Tex. 2020) (dated March 13, 2020, stating that courts may "[m]odify or suspend any and all deadlines and procedures"); *Third Emergency Order Regarding the COVID-19 State of Disaster*, 596 S.W.3d 266, 267 (Tex. 2020) (dated March 19, 2020, clarifying that authorization to modify or suspend deadlines and procedures "applies to all proceedings under Subtitle E, Title 5, of the Family Code, and specifically to the deadlines in Section 263.401");

court signed a final decree terminating M.J.'s parental rights to M.S.J. As to Mother, the trial court concluded that the Department had failed to prove that she had engaged in acts or omissions constituting statutory grounds for termination and, as a result, denied the Department's request to terminate her parental rights. Nevertheless, the trial court found that appointment of Mother as managing conservator "would not be in the best interest of the children because the appointment would significantly impair the children's physical health and emotional development." Consequently, the trial court appointed the Department as permanent managing conservator of the children and appointed Mother as possessory conservator.

In one issue on appeal, Mother asserts that the trial court abused its discretion by naming the Department managing conservator because the evidence is factually insufficient to support the trial court's finding that her appointment as sole managing conservator would significantly impair her children's physical health and emotional development.

**STANDARD OF REVIEW**

We review a trial court's decisions on conservatorship for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court abuses its discretion if it acts without reference to any guiding rules or principles such that its ruling is arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004); *Coburn v. Moreland*, 433 S.W.3d 809, 823 (Tex. App.—Austin 2014, no pet.).

Under an abuse-of-discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but instead are factors used to

*In re K.T.S.N.*, No. 01-21-00456-CV, 2022 Tex. App. LEXIS 123, at *15-24 (Tex. App.—Houston [1st Dist.] Jan. 11, 2022) (mem. op.) (rejecting argument that termination order was void by operation of Section 263.401 because dismissal deadline was extended by trial court pursuant to supreme court's emergency orders related to COVID-19).

determine whether the trial court abused its discretion. *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Thus, in applying the standard, we engage in a two-pronged inquiry: (1) whether the trial court had sufficient information upon which to exercise its discretion; and (2) if so, whether the trial court erred in its application of that discretion. *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.). The focus of the first inquiry is the sufficiency of the evidence, applying traditional sufficiency standards of review. *See Zeifman*, 212 S.W.3d at 588. Under the second inquiry, we must decide whether, based on the evidence before it, the trial court made a reasonable decision. *Id.* A trial court does not abuse its discretion so long as there is some substantive, probative evidence to support its decision. *Id.*

When reviewing a trial court's finding for factual sufficiency, we consider and weigh all of the evidence in the record pertinent to the finding. *City of Austin v. Chandler*, 428 S.W.3d 398, 407 (Tex. App.—Austin 2014, no pet.) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). We examine the evidence in a neutral light and will set aside the finding only if the evidence that supports the finding is so weak, or so contrary to the overwhelming weight of all the evidence, as to be clearly wrong and manifestly unjust. *Id.*; *In re N.L.D.*, 412 S.W.3d 810, 818 (Tex. App.—Texarkana 2013, no pet.).

## DISCUSSION

*Applicable Law on Significant Impairment*

To support a finding that appointment of a parent as sole managing conservator would significantly impair the child, either physically or emotionally, the evidence must do more than "merely raise a suspicion or speculation of possible harm." *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied). Generally, the nonparent seeking conservatorship

7

must instead "offer evidence of specific acts or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Lewelling*, 796 S.W.2d at 167; *In re C.L.J.S.*, No. 01-18-00512-CV, 2018 Tex. App. LEXIS 9753, at *9 (Tex. App.—Houston [1st Dist.] Nov. 29, 2018, no pet.) (mem. op.). In other words, the evidence must support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause serious harm to the child. *In re F.E.N.*, 542 S.W.3d at 770; *In re B.B.M.*, 291 S.W.3d at 467; *R.H.*, 2017 Tex. App. LEXIS 1743, at *10-11; *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.). This is a heavy burden that is not satisfied by merely showing that the nonparent would be a better choice as custodian of the child. *In re B.B.M.*, 291 S.W.3d at 467.

Acts or omissions that may "significantly impair [a] child's physical health or emotional development" include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by a parent. *Id.*; *see In re Caudillo*, No. 03-19-00208-CV, 2020 Tex. App. LEXIS 8682, at *11-12 (Tex. App.—Austin Oct. 28, 2020, no pet.) (mem. op.) (discussing significant-impairment standard under Section 102.004(a)(1), standing for grandparents and other persons). "Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.). The material time to consider is the present, and evidence of past conduct may not, by itself, be sufficient to show present unfitness. *Id.* However, a factfinder may infer the present unfitness of the parent to be managing conservator from the parent's recent, deliberate past misconduct. *In re Caudillo*, 2020 Tex. App. LEXIS 8682, at *13

8

(concluding that evidence of parent's past use of marijuana, methamphetamine, and heroin was sufficient to support significant-impairment finding, despite undisputed evidence that she had been sober for seventeen months); *see also Danet v. Bhan*, 436 S.W.3d 793, 798 (Tex. 2014) (concluding that evidence of parent's misconduct two to three years before trial, together with evidence of more recent misconduct and of stability of child's current placement, was legally sufficient to support significant-impairment finding).

*Evidence on November 9, 2020*

The final hearing to terminate Mother's parental rights began more than eighteen months after the children were removed from Mother's and M.J.'s custody and occurred on four days, over eight months. The final hearing first convened on November 9, 2020. On that first day, the Department called conservatorship worker, Lori Hernandez, who testified as to the events leading to the children's removal in April 2019. Hernandez also testified that Mother was complying with her family-service plan by maintaining employment and that she had paid all but $400 of her child-support obligation. In addition, Mother was no longer cohabitating with M.J. and was living by herself in a two-bedroom home that Hernandez considered "appropriate" and with adequate space for the children. Although the trial court had abated Mother's visitations with the children in October 2019, due to her failure to consistently attend the visits, the visitations were reinstated in January 2020, and Mother had not missed any visits since then.

Hernandez also testified that since January 2020, Mother had been consistently submitting to weekly drug tests and attending individual therapy, as required by her family-service plan. According to Hernandez's testimony, in April 2019, Mother tested positive for marijuana while pregnant with M.J.; however, the remainder of Mother's drug tests were

9

negative, including a hair-follicle test administered in January 2020. Mother missed fourteen drug tests in total but had missed only one drug test after December 2019, in May 2020.

As to therapy, Hernandez testified that Mother's therapist reported that, as of September 2020, Mother had not yet made sufficient progress to support a recommendation of a monitored return.[5] The therapist instead recommended that Mother begin supervised visitation with the children outside of the Department office. In addition, Hernandez testified that she was concerned that a psychological test, conducted by a clinical psychologist (not Mother's therapist) and performed in June 2019 as part of Mother's court-ordered psychological evaluation, suggested that Mother was at high risk for committing physical child abuse. Hernandez acknowledged, however, that there were no allegations or evidence that Mother had ever physically abused any of the children and that her therapist was comfortable with her having visitations outside of the CPS office.

Finally, Hernandez testified that A.B and N.B. were happy and doing well in their foster placement and that the foster parents would like to adopt the two boys, although N.B. told Hernandez that he would still like to see his mother. Further, M.S.J. was living with his paternal grandparents, who were meeting his emotional and physical needs and wanted to adopt him. Hernandez told the court that she believed it was in the children's best interest to terminate parental rights so that the children could be adopted.

---

[5] A monitored return occurs when the trial court, without rendering a final order or dismissing the suit, issues a temporary order that: (1) finds retaining jurisdiction is in the child's best interest; (2) orders the Department to (a) return the child to the parent or (b) transition the child from substitute care to the parent, according to a schedule, while the parent completes the remaining necessary requirements of his or her service plan; (3) orders the Department to continue to serve as temporary managing conservator; and (4) orders the Department to monitor the child's placement to ensure the child is in a safe environment. *See* Tex. Fam. Code § 263.404.

*Evidence on February 8, 2021*

When the hearing reconvened on February 8, 2021, Mother was the sole witness. In her testimony, Mother told the trial court that she believed that it was in her children's best interest to be returned to her because she had complied with all the requirements of the Department, had been continuously employed with Bush's Chicken for over a year, and was financially stable with a home that could accommodate her children.

Mother testified that she had been attending individual therapy on a weekly basis since July 2019 and that she was making progress and working through her issues with past marijuana use and with abusive relationships. Mother offered, and the trial court admitted into evidence, a letter from her therapist, dated November 8, 2020. In the letter, the therapist states, in part:

> Beginning in January 2020 to March 2020, [Mother] was able to make a complete turnaround in her life with the assistance of family and resiliency. During the course of treatment, [Mother] has developed empathetic communication skills, problem solving strategies and she completed Nurturing Parenting Curriculum. . . . She now has an understanding of the cycle of domestic violence and the effects that has on her children. . . . [Mother] has her feet firmly on the path of wellness and healing.

The therapist concluded that he "strongly recommend[ed]" that Mother "be given the opportunity to earn a monitored return of children."

As to her relationship with M.J., Mother acknowledged that M.J. assaulted four-year-old N.B. but denied that M.J. had slapped him across the face. Mother instead described the assault that led to M.J.'s arrest as an incident where "[N.B.] was trying to get out of [M.J.]'s arms and [N.B.] hit his head on the table." Mother admitted that she continued to live with M.J. for approximately seven months after he was arrested for assaulting N.B. Mother also testified,

however, that she had not had any personal contact with M.J. since February 2020, after he physically assaulted her and she "filed the protection on him." Mother denied smoking marijuana in her home but admitted that she had allowed M.J. to smoke marijuana in the home and acknowledged that this type of drug use around her children was "not okay." At the conclusion of Mother's testimony on February 8, 2021, the trial court ordered an extension of the case for the purpose of giving Mother "a chance to earn a monitored return based on the therapist's recommendation."

*Evidence on May 10, 2021*

The final hearing reconvened a second time on May 10, 2021. At this hearing, the Department called Leslie Zuzimbo-Robbins, a caseworker supervisor at the Department. Zuzimbo-Robbins testified that she was assigned to the case in September 2020 and that she had observed some of the visits between Mother and N.B. and A.B. Zuzimbo-Robbins explained that during these visits, the children did not appear to be bonded to Mother and that they were happy and content with their foster parents. She also testified that since the February hearing, Mother's therapist had left the practice group and that Mother had been assigned to a new therapist. According to Zuzimbo-Robbins, Mother's new therapist recommended reunification between Mother and the children but also recommended that "the process should be gradual to eliminate overwhelming her and the children during the reunification process." Nevertheless, Zuzimbo-Robbins explained to the trial court that the Department was still recommending termination of Mother's parental rights because "moving these children out of their home that they've been in for almost two years would be detrimental." At the conclusion of testimony, the trial court urged the Department to begin unsupervised visits on a weekly basis, and then reset the case for two months to "see if we're looking at a monitored return."

12

*Evidence on July 12, 2021*

The final hearing reconvened for a third and final time on July 12, 2021. On that day, the Department called the conservatorship worker most recently assigned to the case, Jocelyn Pizzaro. She testified that since the previous hearing in May, Mother had continued her individual therapy with her new therapist and completed her protective parenting classes. According to Pizarro, Mother's therapist was recommending unsupervised visits, but "[w]e still don't have a recommendation for a monitored return from the therapist."

Pizarro reported that Mother was now having unsupervised visits with the children, the visits were going well, and the Department generally was not concerned about the safety of the children during these visits. Pizarro also testified, however, that the Department had become concerned about recent actions by M.J. Specifically, the Department learned that, several weeks before the hearing, M.J. had gone to Mother's home and broken out her car window. In addition, M.J. had been leaving Mother harassing and threatening text and voice messages. Although Mother reported the matter to the police, she had not yet obtained a protective order and told Pizarro that it was because "she doesn't have enough for them to put something in place."

Pizzaro testified that, as far as she knew, Mother had been trying to keep M.J. away from her, but Mother's therapist recommended that any unsupervised visits occur away from the home until the protective order could be secured. The Department recommended to the trial court that the children stay in their current placements and that the Department remain as managing conservator. Pizzaro told the court:

> We, [the Department staff], don't have any doubt that mom loves her children and
> that she wants to be with her children. We're just concerned with the ongoing
> safety concerns that pop up throughout the case, and we're concerned that if the

13

children are brought back to the home that they're going to be put in the same position that brought us here in the first place because of [M.J.].

Finally, the Department called the guardian ad litem, Cathy Rothas. When asked for her recommendation, Rothas informed the court that she did not feel that grounds for termination existed but that she had "serious concerns about the children being returned to mom full time." Rothas explained,

Number one is her work schedule. She works evenings and weekends. She works a lot of hours. Number two is her support network. Her brother, if I'm not mistaken, had CPS injury to a child out of Lampasas County. Her child was injured. That's how this case started. And then she has CPS history with her mother as a child. And those are her support people. So those are very concerning to me.

Additionally, her contact with the Dad, [M.J.]. [Mother's] phone number and address have changed, yet [M.J.] is still able to have contact with her. . . .

I really feel like it's in the best interest and safety of these children that they remain in their homes and have a relationship with their mom.

The trial court then heard rebuttal testimony from Mother. Concerning the recent events with M.J., Mother testified that after M.J. moved out of her previous home, he would call and text her "20 to 30 times a day" and continued to do so throughout 2020 and 2021. Then, two weeks before the hearing, M.J. went to Mother's current home and broke a window on her car. According to Mother's testimony, she reported the window-breaking incident to police. In addition, even before the incident, she had contacted the county attorney's office to obtain a protective order against M.J., but the prosecuting attorney was out of the office on vacation.

Mother denied informing M.J. of the location of her current home and explained that she did not know how M.J. found her address. When questioned about why she had not moved from her current home to get away from M.J., she stated, "Because I need the evidence to

14

prove to the cops. The cops told me that if I moved then there would not be enough evidence to put the restraining order on him." When asked whether the police told her not to block him on her phone, Mother responded, "They told me not to move, they told me not to block him because there would not be enough evidence against him for the restraining order." Mother acknowledged that because of M.J.'s actions, "there [was] a safety concern with her home" and that the purpose of a protective order was to protect herself and her children.

As to the Department's and guardian ad litem's concerns about her work schedule, Mother testified that if the children were returned to her, she would re-enroll them in the daycare that they previously attended and that the children had been happy there. She also testified that she was currently working a lot of hours because she had the time to do so, but that she would request work hours that aligned with the children's daycare schedule when they returned to her care. Finally, Mother denied having contact with her brother who had CPS history and told the court that while she loved her mother, she would put her children first.

*Analysis*

To succeed on its request for managing conservatorship, the Department was required to rebut that presumption that Mother should be appointed sole managing conservator by presenting a preponderance of credible evidence that Mother engaged in specific, identifiable behavior demonstrating that naming her as her children's managing conservator would significantly impair the children's physical or emotional development. *See* Tex. Fam. Code § 263.404(a); *In re B.B.M.*, 291 S.W.3d at 467.

The undisputed evidence presented by the Department at the final hearing establishes that Mother used marijuana in the past, including shortly after A.B. and N.B. were removed from her custody in April 2019 and while she was pregnant, and that at the time of

15

removal, Mother was not attending to some of the children's basic needs. In addition, Mother lived with M.J., who was abusive toward her and the children, and she allowed her children to remain in that unsafe environment for some unspecified period of time before they were removed. She also downplayed the incident of abuse toward N.B. that resulted in M.J.'s arrest and N.B. and A.B.'s removal and continued to live with M.J. for seven months after the removal. In sum, the evidence in support of the Department's request for managing conservatorship establishes that, in the past, Mother had used marijuana and, by not leaving M.J., had failed to provide her children with a safe and stable home.

On the other hand, the trial court also heard evidence that beginning in January 2020, Mother made significant progress in changing her past behaviors. Department representatives testified that since this time, Mother has complied with her family-service plan, maintained continuous employment, and moved into a two-bedroom home that the Department considers to be suitable and appropriate for the children. In addition, she obtained a protective order against M.J. in January 2020, after he assaulted her, and was no longer romantically involved with him. Mother has consistently attended individual therapy, in which she is addressing her issues with past marijuana use and relationship choices, and she completed a protective parenting program. Although neither of Mother's therapists recommended a monitored return of the children, her most recent therapist recommended a "gradual reunification" that would "eliminate overwhelming her and the children," and the Department considered her unsupervised visits with the children to be going well. Mother submitted to weekly drug testing and, with the exception of missing one test, has returned "negative" results since January 2020. Her only positive test was for marijuana in April 2019. There was no

16

evidence presented suggesting that Mother was ever abusive to the children or that she committed acts of domestic violence.

By the last day of the final hearing, the primary concern expressed by the Department was of the continued danger posed by M.J. and, consequently, the safety of Mother's home. However, the only evidence of specific acts or omissions by Mother relevant to this concern was that, although she had reported M.J.'s behavior to the police, she had not yet obtained a protective order and that, despite months of harassment, she had not moved again or changed her phone number.

We conclude that the evidence presented by the Department of Mother's misconduct—most of which occurred eighteen to twenty-six months before the conclusion of the final hearing—is factually insufficient to support the trial court's finding that appointment of Mother as managing conservator would significantly impair the children's physical health or emotional development. *See In re S.T.*, 508 S.W.3d at 492 (in determining whether children will be significantly impaired, "the material time to consider is the present"). That is, after considering all of the evidence in a neutral light, we conclude that the overwhelming evidence shows that Mother has done everything required by her service plan to achieve reunification; that considering the length of time since her last incident of misconduct, she is presently fit to be the managing conservator of her children; and that any risk of danger posed by M.J. and by Mother's failing to obtain a protective order against him before the final hearing fails to rise above mere "suspicion or speculation of possible harm." *See In re B.B.M.*, 291 S.W.3d at 467; *Whitworth*, 222 S.W.3d at 623 ("The link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm."). Therefore, the trial court's decision to appoint the Department and not Mother as the children's permanent

managing conservator was unreasonable and constitutes an abuse of discretion. We sustain Mother's sole issue on appeal.

## CONCLUSION

We reverse that portion of the trial court's decree appointing the Department as permanent managing conservator of N.B., A.B., and M.S.J. and remand the case to the trial court for a new trial on the issue of conservatorship.

_____
Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Kelly and Triana

Reversed and Remanded

Filed: February 11, 2022