# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-22-00067-CV

### T. E., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 318535, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

T.E. (Mother) appeals from the trial court's order appointing the Texas Department of Family and Protective Services as her child, Derek's, permanent managing conservator and not appointing her as a managing or possessory conservator.[1] *See* Tex. Fam. Code §§ 153.131 (providing that parent shall be appointed managing conservator unless court finds that appointment would not be in child's best interest because "the appointment would significantly impair the child's physical health or emotional development"), .191 (providing that parent who is not appointed managing conservator shall be appointed possessory conservator unless court finds that appointment would not be in child's best interest and that possession or access "would endanger the physical or emotional welfare of the child"). Mother contends that the evidence is legally and factually insufficient to overcome the statutory presumptions to deny

---

[1] We refer to T.E. as Mother, to her son as "Derek," and to other family members by their relationship to Mother or Derek. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

her any conservator appointment. For the following reasons, we reverse the trial court's order and remand for further proceedings.[2]

## BACKGROUND

The Department filed its original suit affecting the parent-child relationship in July 2020 seeking termination of Mother's and Father's parental rights or appointment of the Department or a person as Derek's permanent managing conservator. It attached to its petition an affidavit setting out facts supporting its allegation that there was an immediate danger to the physical health or safety of Derek because he was the victim of neglect or abuse and requesting emergency orders allowing the Department to gain possession of him and be appointed his temporary managing conservator. In the affidavit, Jessica Perry—a Department investigator— averred that the Department became involved with Mother on May 29, 2020, when it received a report that Mother's brother (Uncle) had neglectfully supervised one-year-old Derek and that Uncle and Mother had been involved in a "physical altercation" while Mother held Derek in her arms. The trial court rendered an emergency order permitting the Department to remove Derek from Uncle's home, where Mother and Derek had been residing.

Mother and Father[3] each appeared pro se at the final January 25, 2022 hearing and testified. Department caseworker Monica Salazar; Uncle; Mother's therapist, Amirah Saldivar Smith; Mother's mother (Grandmother); Mother's sister (Aunt); and Derek's guardian ad litem also testified. The trial court admitted into evidence the Department's final report to the court,

---

[2] The order also did not make any conservatorship appointment as to Father, but he does not appeal from the order.

[3] Father testified at the final hearing that he had been an "absent father" due to work-training requirements in New Mexico. He therefore was not present during the alleged altercation.

2

home assessment performed on Uncle, family service plans for both parents, and emergency-removal affidavit.

After trial, the trial court rendered a final order specifying that Mother is not appointed as Derek's managing or possessory conservator and made the necessary statutory findings in support thereof. *See* Tex. Fam. Code §§ 153.131, .191. The order appointed the Department as Derek's sole managing conservator, appointed Uncle as Derek's possessory conservator, and ordered that Mother have visitation with Derek at the discretion of the sole managing conservator because such possession and access was the "least restrictive limitation[] to protect the physical and emotional welfare of the child and is in [his] best interest."

## SUMMARY OF EVIDENCE

### *The removal affidavit*

Perry averred that after speaking with Mother, Uncle, Uncle's wife, and others to investigate the allegations, she discovered that Uncle and his wife had "had concerns for [Mother's] ability to care for [Derek] for the past few months when [she] stopped interacting and responding to [Derek]." Uncle and his wife had observed that Mother "would not tend to [Derek's] daily needs and would simply allow him to cry." They also recently had learned that Mother had "stopped going to work," "was admitted to Scott and White for postpartum depression and suicidal ideations," and had "crashed her vehicle in Waco and left it on the side of the road." After the accident, Mother allegedly had walked into Scott and White in Waco and had tried to "clock into" the facility even though she did not work there. Due to these behaviors, Uncle had told Mother that she needed to move out of his home, leave Derek with him and his

3

wife "until she got situated," and give him "power of attorney" so that he and his wife could tend to Derek's needs.

Uncle told Perry that he and his wife had been concerned about Mother's ability to care for Derek for about three months. She had begun tending less to Derek, was becoming impatient with him and spending more time getting "fixed up to go out" and "facetiming" with an "unknown male," would sometimes be gone from the home "for days," and had stopped going to work and "simply slept all day." Uncle grew concerned for Derek's safety in the home because Mother's bedroom was upstairs and she did not place a baby gate on the stairs despite his advice for her to do so. After Derek "ended up falling down the stairs," Uncle moved the child into a crib downstairs in his bedroom "to ensure the child was cared for and tended to."

Uncle described Mother to Perry as someone who "tends not to deal with life and runs away from responsibility rather than deal with the situation." Mother had "always been catered to and has never dealt with life responsibilities"—which explained how she and Derek had come to live with Uncle from her previous home in Alabama. After Uncle informed Mother that she needed to move out, and she had signed the power of attorney and agreed to leave Derek in Uncle's care, Mother nonetheless attempted to take Derek with her. The "physical altercation" occurred because Uncle "feared for the child's safety and wellbeing due to [Mother's] erratic behaviors, lack of caring for the child, and not having a place to stay." When, in attempting to take Derek with her, Mother "struck at [Uncle] and nearly hit the child," Uncle "reacted out of instinct and punched [Mother] in the face."

Through her investigation, Perry learned from Mother that she had been experiencing hallucinations, memory loss, erratic behavior, and feeling like she had "been drugged" the last few months and had checked herself into at least two psychiatric facilities.

4

Mother explained to Perry that she believed her recent behavior had been due to a reaction to the medication she had been prescribed. Mother explained that she had been "sent home from work because she was having hallucinations." Mother did not recall what the hallucinations were about, and she had been feeling "like she was on drugs" and "could not control herself." She was having impulsive behaviors and thoughts. After being sent home from work and taking a week of medical leave, she was still not "feeling right" and checked herself into "Metroplex," another facility, from which she was released after two days, whereupon she checked herself into Seton hospital and was released "after a couple of hours." Both facilities released her with "no medical reason to be admitted." Mother could not remember several incidents from the past few weeks, including the car crash in Waco, and so she agreed to Perry's request to follow a "safety plan" with respect to Derek. Mother provided Perry with a doctor's note dated June 8, 2020, excusing her from work "due to a medical reason" and providing that she would be cleared to return to work "after psychiatry clearance." The note stated that Mother "is safe to be with her son with continued supervision of friend or family member."

On July 6, 2020, Perry spoke with a registered nurse who works with Mother's medical doctor and learned that Mother had been prescribed Prozac in mid-May, which is given to treat bipolar disorder and depression. The nurse indicated that erratic behaviors and memory loss were not known reactions to the medication and noted that Mother's doctor had not advised her to stop taking her medication and referred her to MHMR.

In late June 2020, Mother informed Perry that she was planning to leave the state with Derek to go to Alabama. Perry informed Mother that if she did so, she would be violating the safety plan and "there would be concerns for [Derek's] safety." Mother explained that she understood and would not leave the state. In early July, Mother again told Perry that she was

5

planning to take Derek with her to Alabama, and Perry advised her that the safety plan would not allow that until Mother provided documentation from her doctor that she was cleared to be a primary, unsupervised caregiver for Derek. Around the same time, Perry spoke with Mother's therapist, who could "not recommend [having Mother's] supervision [of visits with Derek] lifted" and that "monitored supervision should be tapered off and not suddenly lifted." A few days later Mother again informed Perry that she was boarding a plane to Alabama the next day with Derek. The day before Mother's planned flight, the trial court signed an emergency order appointing the Department as Derek's temporary managing conservator and authorizing his removal from Uncle's home.

### The Department's final report to the court

About a month and a half before the final hearing, the Department filed with the court its final report. The report indicated that Mother had completed most of her family service plan: obtaining full-time employment and a home suitable for Derek, maintaining contact with the Department, taking drug tests and abstaining from illegal drug use, attending court hearings and visitations with Derek, and completing a psychological evaluation. The August 14, 2020 psychological evaluation stated that Mother was diagnosed with child neglect, major depressive disorder, and generalized anxiety disorder. The psychological report concluded, "In the absence of any unknown factors or newly emerged information to the contrary, [Mother] appears to be a potentially suitable parental resource at this time. However, it is essential to obtain verification from the prescribing physician regarding her contention that the behaviors of concern were likely to have been due to medication side effect." The report also recommended that contact "be established" with Mother's parents to "clarif[y]" her "contention of having been free of all

6

similar prior difficulties and related concerns in regard to parenting." It recommended the Department obtain and review Mother's medical records from her "evaluation and treatment at MHMR" and "recent hospitalization at Scott and White" and consider family therapy for Mother and Derek to aid in the quality of Mother's interaction, bonding, and attachment to the child.

The final report noted that despite Mother's efforts, she had not demonstrated the ability to meet Derek's basic needs and ensure his safety due to her concerning behaviors such as going to different Department offices and refusing to leave until speaking with "someone of higher command" and reporting to Department personnel that she had not seen her son "when in fact she was having weekly visits supervised by the Department." Mother had been claiming that she could not contact Salazar or her supervisor, but Mother had not attempted to reach them. Mother's service plan required her to participate in individual counseling, but she had been discharged from her Department-appointed counselor "due to ethical reasons" because she "continues to see an outside counselor," and that outside counselor (Smith) had not responded to the communications of the Department's counselor. The Department was concerned that Mother would provide "conflicting" information to each counselor if she continued to see both. While Mother's service plan also required her to participate in family counseling with Uncle, both Mother and Uncle were unsuccessfully discharged after a few sessions because of their failure to "follow communication rules during the sessions."

Mother had recently been having two hours of weekly unsupervised visitation with Derek, which had been "going well." Mother had arranged her work schedule to allow for the visitations, and Derek "looks forward to seeing" Mother. Mother had been reporting for weekly Department drug tests through April 2021 and monthly tests for two months thereafter, after which the Department ceased requesting her to test due to her consistent negative results.

7

*Caseworker Salazar's testimony*

Salazar testified that the Department recommended it be named Derek's permanent managing conservator and that Uncle and his wife, who had become licensed foster parents after their home study was approved, were "currently working on [becoming] PMC [permanent managing conservators] for the PCA [Permanency Care Assistance] program." The Department recommended that Mother's visitation schedule of two unsupervised hours per week be continued. Salazar explained that she did not believe that Mother could provide a safe and appropriate home for Derek because her "mental stability" and emotions are unpredictable and "up and down." While some times Mother "appears to be safe and stable," at other times she is "aggressive" and has high anxiety, making it difficult for Salazar to communicate with her. Salazar had had at least fifteen interactions with Mother during the pendency of the case and Mother's mental stability seemed questionable regularly, including the following behaviors: "constantly yelling on the phone"; crying; getting upset and being unable to "calm herself down"; "overtalk[ing]" and not listening; going to other Department workers' offices besides Salazar's, "demanding to speak" to them, and refusing to leave until she did; and reporting to other Department staff members that Salazar was not returning her phone calls despite Salazar having no record of any calls from Mother.

Salazar testified that she believed Mother's behavior and mental instability would endanger the well-being of a small child in her sole care. She believed that Mother was currently on medication, perhaps for anxiety, but she was not sure what it was. On cross-examination, Salazar testified that she was not aware that Mother was not currently on any medications. Salazar explained that the counselor the Department provided for Mother to complete her service plan "ended up unsuccessfully discharging" her, so Mother continued to stay with the counselor

8

of her own choosing whom she had been seeing since before the Department became involved. Salazar stated that she believed charges against Uncle for the "altercation" between him and Mother were dropped because there was not enough evidence. Salazar noted that Derek had once been suspended or expelled from daycare for biting, and the Department did not provide him any early-childhood intervention (ECI) services because he "was on target and there were no concerns."

### *Uncle's testimony*

Uncle testified that two-and-a-half-year-old Derek had been in his care and in his home "since pretty much he was born." Mother moved in with Uncle before Derek was born, and after Derek's birth Mother initially and primarily took care of Derek and was "real responsible," but her parenting "quickly shifted." Uncle said Mother began acting "real red," stopped talking to him, exhibited "weird" behavior that was "strange" for her, and said things that did not make any sense but then changed her response when Uncle told her she had not made sense. Uncle told Mother that he could care for Derek while she "work[s] on whatever she works on." She agreed to let Uncle move Derek's crib downstairs to his and his wife's room from Mother's upstairs room so that Uncle could handle the primary parenting duties such as diaper changes and late-night feedings. From then on, Mother's interactions with Derek were "50/50," in that "some days she was good, and some days she slept all day" and then started being gone for entire days. It was a "drastic change" from how she had been. One time Mother had been gone for three days, and Uncle did not know where she was but only discovered that she had been in a car wreck in Waco when the police called him. Mother could not remember anything about the three days or about the car wreck, and Uncle cared for Derek the entire time

9

Mother was gone. After Uncle retrieved Mother from Waco, he "checked her in[to a clinic] for her mental stability" in Temple where she remained for two days and was diagnosed with postpartum depression, given medications, and placed on "some sort of psychiatric hold."

After her release from the clinic and return to Uncle's home, Uncle told Mother that he would keep Derek while Mother left and got better. Mother seemed to understand what Uncle said and began gathering her things to move out, but then suddenly "grabbed [Derek] and proceeded to walk out." Uncle insisted that Mother leave Derek and "grabbed him out of her arms," but then Mother demanded her child, and Uncle reached out his arm in front of the child to restrain Mother from taking him. Mother then started scratching, hitting, and kicking Uncle and claiming he was choking her. Uncle called medical personnel to attend to the injuries Mother suffered from the altercation, including bruises and a facial fracture, for which Uncle was arrested. Shortly after this incident the Department removed Derek from the home for three months, after which time Derek was returned to Uncle's care.

Uncle testified that during the case's pendency he had not noticed any improvements in Mother's "mental health" and the way she interacts with others. Uncle is concerned about Mother's interactions because she refuses to accept "any type of truth," "goes from normal to a hundred thousand degrees in less than a second," and gets so unreasonable that she "talks . . . out of the side of her mind." She is "irrational" and "doesn't think things through," and "her thinking process is totally off." She was acting the same way both before she was admitted to the Temple hospital and after her release. Uncle and Mother participated in family therapy for five sessions, but Uncle stopped attending because he felt the sessions were unproductive because Mother continued "display[ing] the same thing[s]" in her behavior—the

10

irrationality, the overtalking, and getting overly "upset" when, for instance, Uncle expressed displeasure that she had been four hours late to pick up Derek recently.

Uncle and his wife had completed all of the training and other requirements for the PCA program and were in a two-month waiting period to complete the mandatory time requirements. He explained that he would be willing to allow Derek to continue to have a relationship with Mother but was committed to making decisions that were best for Derek, even if he had to refuse to allow Mother contact with the child.

Uncle testified that Derek had fallen down the home's twenty-one stairs twice while Mother was asleep but supposed to be caring for the child. Mother would not allow Uncle to take Derek to the hospital after those falls and, thus, there are no medical records of them. Uncle testified about his familiarity with Derek's asthma and home treatment for the condition, including his use of a nebulizer machine and medications as needed. Derek's asthma had been improving, and Uncle had made sure to leave a nebulizer machine at Derek's school in case he needed it there. Uncle explained that he has stepped in to take care of Derek because of Mother's neglect and there being no one else who could provide the care. He does not have "any agenda" as to Derek except to be his "voice" until he can "speak[] for himself" and say "who he wants to be with." While he has not attacked Mother's character during the pendency of this case, she has attacked his through lies on social media and to others.

### Mother's testimony

Mother testified that the records documenting her visitations with Derek do not identify any erratic behavior on her part or endangerment of Derek, and the caseworkers have expressed "how good of a parent" she has been during the case's pendency. She explained that

11

she was "misdiagnosed" with postpartum depression by a nurse practitioner, and when she took the prescribed medication she had a "bad reaction" that "caused confusion" and a lot of "other issues" including seizures. After she was better from that medication episode, she got a "psych evaluation," which she provided to Salazar, and a follow-up visit with her doctor who "immediately took [her] off of the medication." She had been in the hospital for treatment "of the medication," fever, and a seizure but was not hospitalized on suicide watch or risk of harm to others. She testified that she was not currently on any medications, and the depression "has been completely removed from [her] medical record" because she had never had depression but instead had been experiencing anxiety, as proved by her "psych doctor" and her medical doctor.

She explained that when she went to Department offices and allegedly acted "erratically," she had been merely concerned about Derek's asthma and getting him counseling and was not pleased because her concerns had been "ignored," as she had sent messages to Salazar but not received responses. She was not disrespectful to people at the office but merely had asked questions, and she was never escorted out by security. Mother testified that she does not communicate with Salazar because she "tell[s] lies in her documents" about Mother, prompting Mother to make five complaints to the Department about Salazar "perjuring herself in documents." Mother stated that she was uncomfortable being around Salazar because the Department was investigating her regarding Mother's complaints and because of Salazar's continued "lies" in Department and court documents. Mother was displeased with Salazar because Derek had not been provided any counseling despite Mother informing Salazar that her individual therapist had recommended the child (who was sixteen months old at the time) receive counseling for the anxiety he was likely suffering from witnessing the altercation between her and Uncle.

12

She pointed out that Uncle had been abused and molested as a child and "never got treatment for that," and she was concerned that he might not get medical treatment for Derek should he need it. She testified that Uncle admitted in family counseling with her that he "has a temper" and "when he gets upset he cannot control hi[m]self" but is not doing any personal counseling. Mother explained that when Uncle testified that she had been late for a family-therapy session, she had been driving back from Dallas looking for a home for her and Derek and traffic had been "hectic." In the session, which occurred at Uncle's house due to Mother's lateness, Uncle was "out of control"—"hitting himself," hitting the desk, and standing up and clenching his fists—and Mother was scared. Due to Uncle's behavior, she requested a police escort the next time she retrieved Derek for an unsupervised visitation.

Mother testified that she had been having unsupervised visitations with Derek for twelve-hour days, and it was only after Uncle started getting upset in family counseling that her visitations were cut shorter. Mother expressed concern that another altercation between her and Uncle might occur, witnessed by Derek, when they are doing an exchange for a visitation, and she was concerned about the child witnessing Uncle "screaming and hollering" again because it had been traumatic for the child and "took a long time for [him] to calm down." When she had picked up Derek early some mornings for visitation, she noticed that he was "wheezing" and had fevers. She is a certified nursing assistant and has administered breathing treatments for patients and knows "the signs when a patient is not getting their breathing treatments." She also had to send Derek's asthma medicine to school to ensure he had it and had to buy him warm clothing that was "more appropriate for the weather" when she picked him up from Uncle's for visitations. Mother sends gifts to Derek and buys him clothes, food, and snacks to take to Uncle's home.

13

If Mother were to get Derek back, she planned to move to Alabama with him, where she and Uncle have family, so that Derek can be "a part of all of his family and not just [Uncle] and his wife." She had been looking for a home in Alabama, but until she found one she and Derek could stay with Grandmother or Aunt. Mother explained that she was currently employed as a health care advisor, working from home full-time plus about five hours weekly in overtime, making $14.50 per hour.

### Smith's testimony

Smith, Mother's therapist, testified that she had had about thirty-five sessions with Mother after Mother was referred to her by a nurse practitioner in June 2020. Smith had informed Salazar around that time that it was not appropriate for Mother and Uncle to have family counseling until Uncle had participated in individual therapy "to address his own individual issues," including domestic violence, but the Department nonetheless proceeded with family counseling. Smith had "expressed concerns" to Salazar and those in higher positions at the Department that Derek was not receiving therapy after witnessing the Mother–Uncle altercation despite the child's troubling behavior since that event at daycare, including his being "expelled" a couple of times.

Smith had "noticed a lot of progress" in Mother since she began therapy. Mother had been "very receptive to guidance regarding how to work with [Derek]" and as to resources Smith had provided, including recommendations on books to read and ways to interact with Derek and help him deal with his emotions in an appropriate way. Even though Mother had expressed how overwhelmed she felt with meeting all of the requirements of the service plan and obtaining employment, she had gained employment and reliable transportation within a month

14

of working with Smith. Smith stated that Mother was no longer on medication and was "using really good coping skills." Wanting to make sure she had not "missed anything" with respect to Mother's mental-health issues and ability to parent, Smith conducted some standardized assessments on Mother including the Adult Adolescent Parent Inventory (AAPI-2.1) and the Parenting Stress Index. The AAPI-2.1 "looks for whether or not a parent has the potential for future abuse as well as if there's concerns for current abuse of a child," and Mother's results were "within normal to low risk." Smith had provided a copy of the test results to the Department the day before the final hearing.

### Grandmother's testimony

Grandmother testified that she had not noticed any problems Mother had with caring for Derek and has taken "very good care" of him. She explained that she was disappointed with Uncle because when Mother had gone missing for three days and was admitted to the hospital, Grandmother (who lives in Alabama) and Uncle had agreed that either Uncle would bring Derek to Alabama or Aunt would come retrieve him so that Mother and Derek could live with Grandmother. Grandmother said that it is not right to blame Mother for "being sick" at that time and that Mother needed help but Uncle stated he could not help Mother and could not take care of Derek either, but now Uncle was wanting to take care of Derek. If Derek were to be placed with Mother, Grandmother would "not have any concerns" about his health or well-being.

### Aunt's testimony

Aunt testified that she had not noticed "any problems" with Mother caring for Derek since he was born. She stated that she had learned about Mother "being missing" after she

had received a phone call from Mother "that was erratic and out the way," and then after a phone call with Uncle learned Mother was in the hospital. After Mother's getting "sick" and hospital admission, Aunt and Uncle had made arrangements for Derek to be transported to Alabama.

### *Guardian ad litem's testimony and recommendation*

Derek's guardian ad litem testified that Derek's biting behavior at daycare was "completely age appropriate." She stated that his behavior has since improved and that his daycare has "no concerns with the care [Derek] is receiving from" Uncle. She recommended that the Department be appointed permanent managing conservator to allow Uncle time to meet the requirements of the PCA program. She believed it was appropriate to maintain Mother's visitation "as it is" (two unsupervised hours per week) and that both parents should be ordered to pay child support.

## DISCUSSION

In two issues, Mother challenges the trial court's order appointing the Department as Derek's permanent managing conservator and not appointing her as managing or possessory conservator. She challenges the legal and factual sufficiency of the evidence to support the trial court's findings that (1) her appointment as a managing conservator would not be in Derek's best interest because it would significantly impair his physical health or emotional development, *see* Tex. Fam. Code § 153.131(a), and (2) her appointment as possessory conservator would not be in Derek's best interest and her possession or access would endanger his physical or emotional welfare, *see id.* § 153.191. Mother primarily argues that the evidence is legally and factually insufficient to support the trial court's conservatorship findings because the court could not reasonably have made such findings in light of both the Department and guardian ad litem's

16

opinions that Mother's unsupervised visitation with Derek should continue and the uncontroverted evidence that Mother had been exercising unsupervised visitation for some time without any concerns.

Sections 153.131 and 153.191 each create a rebuttable presumption in favor of the appointment of a parent as managing or possessory conservator, respectively. *See id.* §§ 153.131, .191. In other words, it is presumed that the appointment of a parent as managing or possessory conservator is in the child's best interest *unless* the trial court makes the required statutory findings. *See id.* §§ 153.131, .191; *J.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00162-CV, 2021 WL 2834719, at *3 (Tex. App.—Austin July 8, 2021, no pet.) (mem. op.).

### *Applicable law and standard of review*

We review conservatorship determinations under the abuse-of-discretion standard of review. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court's conservatorship determination "may be reversed only if the decision is arbitrary and unreasonable." *Id.* Legal and factual sufficiency are not independent grounds of error under this standard but are factors used to determine whether the trial court abused its discretion. *In re K.S.*, 492 S.W.3d 419, 426 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). Under this standard, an appellate court considers whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion. *Zeifman*, 212 S.W.3d at 588. Traditional sufficiency review applies with regard to the first question. *Id.*; *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.); *see City of Keller v. Wilson*, 168 S.W.3d 802, 807, 810 (Tex. 2005) (describing legal-sufficiency review); *Cain v. Bain*, 709 S.W.2d 175,

17

176 (Tex. 1986) (describing factual-sufficiency review). Under this standard, evidence is legally sufficient when it would enable reasonable and fair-minded people to reach the verdict under review and is factually insufficient only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *J.A.J.*, 243 S.W.3d at 616. The findings necessary to support the trial court's conservatorship decisions against the parent need be supported by only a preponderance of the evidence, rather than clear and convincing evidence. *See* Tex. Fam. Code § 105.005; *J.A.J.*, 243 S.W.3d at 616. A trial court does not abuse its discretion as long as there is some substantive, probative evidence to support its decision. *Zeifman*, 212 S.W.3d at 587; *Echols*, 85 S.W.3d at 477.

When, as here, trial was to the bench, we defer to the trial court's decisions on the credibility of the witnesses and the weight to be given their testimony and on its resolution of conflicts in the evidence. *See Fish v. Lebrie*, No. 03-09-00387-CV, 2010 WL 5019411, at *2 (Tex. App.—Austin Dec. 10, 2010, no pet.) (mem. op.). Usually evidence of a parent's "specific actions or omissions" that demonstrate the award of custody to the parent would have a detrimental effect on the child is sufficient proof to rebut the parental presumptions in Sections 153.131 and 153.161, but the evidence must do more than raise mere suspicion or speculation of possible harm. *See Lewelling v. Lewelling*, 796 S.W.2d 164, 166–67 (Tex. 1990) (holding that best interest of child is served by awarding custody to natural parent absent "evidence of specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child"); *In re B.B.M.*, 291 S.W.3d 463, 467 (Tex. App.—Dallas 2009, pet. denied) (discussing significant-impairment requirement and requiring evidence to do more than raise "suspicion or speculation of possible harm"); *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (explaining that

18

"link between the parent's conduct and harm to the child may not be based on evidence which merely raises a surmise or speculation of possible harm" and that "[t]here must be evidence to support the logical inference that some specific, identifiable behavior or conduct of the parent will probably cause that harm"); *see also In re S.T.*, 508 S.W.3d 482, 492 (Tex. App.—Fort Worth 2015, no pet.) (providing examples of types of parental conduct that may constitute significant impairment, such as severe neglect or drug abuse). The "material time to consider is the present," and "evidence of past conduct may not, by itself, be sufficient to show present unfitness." *J.H.*, 2021 WL 2834719, at *4 (citing *S.T.*, 508 S.W.3d at 492). Evidence that "the nonparent would be a better custodian of the child" than the parent does not overcome the parental presumption. *Lewelling*, 796 S.W.2d at 167.

*Analysis*

Because it is dispositive, we limit our analysis to Mother's challenges to the trial court's decision not to appoint her as a managing conservator of Derek and its underlying finding that Mother's appointment as such "would not be in the best interest of [Derek] because the appointment would significantly impair [Derek's] physical health or emotional development." *See* Tex. Fam. Code § 153.131(a); *M.A.R.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00413-CV, 2020 WL 7294610, at *5 (Tex. App.—Austin Dec. 11, 2020, no pet.) (mem. op.) (addressing father's issue as to managing conservatorship only, and not his issue as to possessory conservatorship, because of disposition reversing and remanding issue of conservatorship for new trial).

There was evidence that Mother had neglected and thereby endangered and "significantly impair[ed]" one-year-old Derek's physical health and emotional development for a

19

period of about three months before the Department became involved, which conduct allegedly resulted in the child's twice falling down over twenty stairs. Evidence indicated that Mother's neglectful behavior appears to have stemmed from the sudden onset of a psychotic episode or mental affliction or possibly as a severe adverse side effect of prescribed medication. The symptoms of Mother's mental state from that time included hallucinations, memory loss, disappearing for days at a time, ignoring the needs of Derek, checking herself in and out of psychiatric facilities, speaking irrationally, and agreeing to safety plans but then attempting to circumvent them.

Uncle and Salazar testified, and the Department's final report indicated, that Mother continued to exhibit "erratic" behavior towards them and Department personnel during the pendency of the case, including yelling, speaking irrationally, refusing to accept truth, "overtalking," and making statements that were inconsistent with facts. While Mother and her therapist testified that Mother was no longer on any medications, and Mother believed that her troubling behaviors (and other symptoms, such as seizures) at the beginning of the case had been the result of side effects to her medications and misdiagnosis, the trial court could have found such testimony not credible or concluded that Mother's continued erratic behavior indicated that her mental issues were still unresolved and unmanaged and would again substantially impair Derek's physical health and emotional development were Mother appointed his managing conservator (with all of its attendant rights and responsibilities), especially considering Derek's young age. Viewing the evidence under the legal-sufficiency standard, we conclude that a reasonable and fair-minded factfinder could have reached the finding required under Section 153.131(a) to rebut the parental presumption. *See Zeifman*, 212 S.W.3d at 588; *Echols*, 85 S.W.3d at 477; *see also M.A.R.G.*, 2020 WL 7294610, at *7–8.

20

However, viewing the evidence under the factual-sufficiency standard, we conclude that the trial court's underlying Section 153.131(a) finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Zeifman*, 212 S.W.3d at 588; *Echols*, 85 S.W.3d at 477. While Mother exhibited some "erratic" behaviors during the pendency of the case, there was no evidence that those behaviors impacted her parenting or interactions with Derek, endangered Derek, affected her abilities to complete most of the services on her plan—including maintaining stable employment and a suitable home—or were of the same ilk as those behaviors at the beginning of the case (e.g., hallucinations, memory loss, feeling "drugged"). Indeed, both the Department and the guardian ad litem believed that Mother was safe and responsible enough to have unsupervised visitation with Derek and continue such visitation, which was "going well," with Derek "looking forward" to seeing Mother. Furthermore, despite Mother's "erratic" behaviors, she was able to complete all of the services on her family plan except for family counseling with Uncle (from which *both* parties were discharged due to failure to follow the therapist's communications rules) and individual therapy with the Department's therapist of choice (but only because Mother continued to see her outside therapist, and the Department considered such doubling up to present unspecific "ethical" problems rather than, for instance, a good-faith attempt to make lasting improvement). Mother's therapist testified that Mother had made good progress in therapy, had been receptive to feedback and suggestions, was not on any medications, and was normal to low risk on the standardized assessments she performed. While the Department faults Mother for continuing her therapy with Smith instead of switching to seeing only the Department's counselor, the evidence shows that Mother had been attending therapy with Smith for a couple of months on her own initiative before being required to attend therapy by the service plan.

21

Mother exhibited a good understanding of Derek's asthma condition, management, and treatment and expressed concern that Uncle might not be managing it well enough, as she had noticed the child having breathing troubles when picking him up early in the morning. The psychological evaluation the Department had Mother undergo early in the case's pendency indicated that she was a "potentially suitable parental resource" and advised that the Department obtain Mother's medical records from her recent hospital admissions, input from her parents about Mother's mental-health history, and confirmation from Mother's doctor about whether her behavior was a side effect of her medication. The Department did not present evidence that it had followed those recommendations. Finally, Grandmother and Aunt both testified that they did not have any concerns about Mother's parenting abilities, and Mother testified that she planned to move to Alabama (where she had more family support, including Grandmother and Aunt) if she were awarded custody of Derek.

In light of the above evidence, we conclude that the evidence was factually insufficient to support the trial court's underlying finding of significant impairment to overcome the parental presumption. *See Zeifman*, 212 S.W.3d at 588–89; *Echols*, 85 S.W.3d at 477–78. On this basis, we sustain Mother's first issue contending that the trial court abused its discretion when it did not appoint her a managing conservator of Derek and do not reach her second issue challenging the trial court's failure to appoint her as a possessory conservator. *See* Tex. R. App. P. 47.1, 47.4.

## CONCLUSION

We reverse the trial court's conservatorship order and remand the case to the trial court for further proceedings consistent with this opinion.[4]

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Triana

Reversed and Remanded

Filed: August 4, 2022

---

[4] Because this suit was tried as a child-protection case, we are of the opinion that the hearing on remand to the trial court must be commenced within 180 days of this Court's mandate. *See* Tex. R. App. P. 28.4(c). On remand, the trial court should consider the child's and parties' current circumstances. *See Shook v. Gray*, 381 S.W.3d 540, 542–43 (Tex. 2012) (explaining that "trial court must be able to consider the changed circumstances" in its determination of conservatorship on remand). Further, after the trial court determines managing conservatorship, it should reconsider its decision on possessory conservatorship in light of its managing-conservatorship determination.