**In the Matter of B.B.M.,
A Child, Appellant.**

No. 05–08–00501–CV.

Court of Appeals of Texas,
Dallas.

June 24, 2009.

Rehearing Overruled Aug. 20, 2009.

Shannon Timberlake Dodd, Coppell, TX, for Ad Litem.

F. Leighton Durham, Cheyenne J. Robertson, and Kirk L. Pittard, Durham & Pittard, LLP, Dallas, TX, for Appellant.

David Cole, Dallas, TX, for Appellee.

Before Justices MORRIS, WRIGHT, and MOSELEY.

## OPINION

Opinion By Justice MORRIS.

In this appeal a father challenges the trial court's order appointing two nonparents as managing conservators of his son. Shawn M. contends the evidence is both legally and factually insufficient to support the jury's finding that appointing him as managing conservator would significantly impair the child's physical health or emotional development. After reviewing the record on appeal, we agree the evidence is factually insufficient to support the jury's finding. Accordingly, we reverse the portion of the trial court's order decreeing managing conservatorship of the child and remand that portion of the cause for a new trial.

### I.

B.B.M. is the biological child of Shawn M. and Samantha M. Shawn and Samantha began dating in 2002 and, soon thereafter, began living together in Granbury, Texas. In June 2003, Samantha gave birth to their first child, a girl named Kaylee. Shawn, Samantha, and Kaylee lived together, with short periods of separation, until late 2004 when Samantha and Kaylee moved out.

Samantha then began dating a man named Darrell and, within a few weeks, Samantha and Kaylee moved in with him. Several months later, Samantha discovered she was five months pregnant. When Shawn learned that Samantha was pregnant, he called Darrell's house to speak to her. The two began arguing and Samantha gave the phone to Darrell. Darrell testified that Shawn asked him, "You and Samantha are having a baby, why don't you just give me Kaylee?"

Samantha immediately began to consider placing the unborn baby for adoption. She discussed the pregnancy with Darrell's mother, who told Samantha that she knew of a couple in Idaho, Travis and Sabra Hess. They wanted to adopt a child. Darrell's mother gave Samantha the phone number of LDS Family Services, the adoption agency the Hesses were using. Samantha then contacted Kimberly Sidwell, one of LDS's caseworkers.

Sidwell met with Samantha two weeks before the baby was due to be born. At that time, Sidwell asked Samantha whether she knew the identity of the baby's father. Samantha told Sidwell that Shawn was the father and indicated he was not aware of her pregnancy. Sidwell asked for an address to contact Shawn, but Samantha said she did not know where he was. Samantha did, however, provide Sidwell with Shawn's date of birth and social security number. After the meeting, Samantha asked LDS if she could work with a different caseworker due to a "personality conflict" with Sidwell.

Samantha next met with Eric Larsen from LDS. Larsen also asked about the paternity of the baby, and Samantha told him she was fairly certain that Shawn was the father. Samantha also stated, however, there was a possibility that the father was Darrell. When Larsen asked where he could find Shawn, Samantha told him she thought he was either living in Dallas or going to school in Florida. After being asked multiple times how to contact him, Samantha finally admitted that Shawn lived in Granbury and gave Larsen a phone number for Shawn's mother, Sandra.

A few days before the baby was born, Sandra received a telephone call from Terri Razo, Samantha's father's girlfriend. Razo informed Sandra that Samantha was due to give birth very soon. When Sandra told Shawn that Samantha was about to give birth, he realized, based on the timing of the pregnancy, that he could be the father. Samantha stated that she believed Shawn always knew how far along in the pregnancy she was, but she admitted she never discussed it with him.

The next day, Sandra was contacted by Larsen, who told her that Samantha named Shawn as one of the baby's possible fathers. Larsen further told her that Samantha was planning to put the baby up for adoption. Sandra testified she informed Larsen that Shawn would not allow the baby to be adopted if he was the father.

After speaking with Larsen, Sandra called the hospital where Samantha planned to give birth. Sandra spoke with Julie Whittenberg, a clinical social worker at the hospital who was assisting with the adoption. Whittenberg testified that Sandra sounded upset and frantic and asked for her help. Sandra told Whittenberg that she and Shawn had recently discovered he might be the father of the baby. Sandra further stated that Shawn would not agree to an adoption.

Whittenberg called Larsen the next day and told him she was aware that Shawn had been left out of the adoption process and informed him that Shawn was not agreeing to the adoption. Whittenberg

asked Larsen how Shawn was going to be able to gain access to the baby to have a paternity test performed. Larsen said that the test probably would not be done.

The day before the baby was born, Shawn called the hospital multiple times attempting to speak with Samantha. Samantha refused to speak to Shawn, but Darrell spoke with him. Darrell testified that the only concerns Shawn raised during their conversation were that his name not be put on the baby's birth certificate and that he not be forced to pay child support. Shawn testified he told Darrell that if the baby was his, he wanted to keep the child and he would not agree to an adoption. Larsen spoke with Samantha later that day. Samantha told him that Shawn was "supportive of the adoption plan."

The baby was born on July 2, 2005. Following the birth, Samantha requested to be designated as a "no information" patient. The designation prevented the hospital from releasing any information about her or the baby except to certain named individuals. Shawn was not named as a person to whom information could be released.

The Hesses were present at the hospital for the baby's birth. Larsen told the Hesses about Shawn and that it was possible Shawn was the baby's father. Larsen also told them that Shawn had been calling the hospital and was concerned about what was happening. The Hesses signed a "Contract and Acknowledgement of Legal Risk in Placement" stating they understood there was a risk the birth parents would not relinquish or terminate their rights to the baby, and the child could be removed from their home "at any time." Samantha signed an affidavit relinquishing her rights, but Shawn was not contacted after the birth. Sabra Hess testified that Larsen told them Shawn had thirty days to file a notice of intent to claim paternity and if he failed to do so, they would be fine. Sabra also testified Larsen told them that "things had been worked out" with Shawn. The Hesses left the hospital with the baby on July 4, 2005 and took him to their home in Idaho. Shawn testified that he had no idea who took his son or where he was taken.

On July 28, 2005, Shawn filed his notice of intent to claim paternity of the baby with the state paternity registry. Larsen did not send a written request to the registry inquiring about potential paternity claims until September 7, 2005. Over a month later, Larsen had not received a reply from the registry, but he received a telephone call from Samantha. Samantha told Larsen that Shawn had called her claiming the adoption was illegal. Larsen then called the paternity registry. He was informed that Shawn had timely filed his notice of intent to claim paternity. Shawn testified he thought that filing the notice of intent would be sufficient to stop the adoption. He further testified that, during the months following the baby's birth, he contacted several lawyers, wrote a letter to the governor's office, and contacted the FBI and a father's rights group in an attempt to assert his rights to the child.

On October 24, 2005, Larsen sent Shawn a letter stating that Samantha had requested LDS's services "to plan an adoptive placement for the baby." Larsen requested that Shawn sign the enclosed affidavit waiving all potential rights, duties, privileges, and child support responsibilities to the baby. The letter further stated that if Shawn refused to sign the affidavit, there would be a hearing requesting that his legal rights be terminated in accordance with Texas law. Larsen told Shawn that signing these forms would "greatly simplify the process for you and Samantha" and would ensure that

the baby was "placed in a loving home with a mother and father."

Two days later, LDS filed suit requesting the termination of Shawn and Samantha's parental rights to the baby. Shawn filed a counter-petition to establish paternity on April 7, 2006. The trial court ordered a paternity test, and the results showed that Shawn, in fact, was the child's biological father. The Hesses intervened in the suit and requested termination of both Samantha and Shawn's parental rights or, alternatively, that they be appointed managing conservators of the child. A trial was held in January 2007, and the jury returned a verdict refusing to terminate Shawn's parental rights. The jury, however, awarded managing conservatorship of the child to the Hesses. The trial court signed its final order in accordance with the jury's verdict on January 7, 2008. Shawn brought this appeal seeking to reverse the trial court's judgment relating to the managing conservatorship of his son.

## II.

 The strong presumption that the best interest of a child is served by appointing a natural parent as managing conservator is deeply embedded in Texas law. *See Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990). To overcome this presumption, a nonparent must prove by a preponderance of the evidence that appointment of the parent as managing conservator would significantly impair the child's physical health or emotional development. *See* Tex. Fam.Code Ann. § 153.131(a) (Vernon 2008); *see also Lewelling,* 796 S.W.2d at 167. The evidence cannot merely raise a suspicion or speculation of possible harm. *See In re De La Pena,* 999 S.W.2d 521, 528 (Tex.App.-El Paso 1999, no pet.). Instead, the evidence must support the logical inference that

some specific, identifiable behavior or conduct of the parent will probably harm the child. *Id.* Evidence that a nonparent would be a better custodian of the child is wholly inadequate to meet this burden. *See Lewelling,* 796 S.W.2d at 167.

 Shawn alleges that the evidence is legally and factually insufficient to support the appointment of the Hesses as his son's managing conservators. In reviewing a challenge to the legal sufficiency of the evidence, we must determine whether the evidence, as a whole, would enable reasonable and fair-minded people to differ in their conclusions. *See OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P.,* 234 S.W.3d 726, 736 (Tex.App.-Dallas 2007, pet. denied). We view the evidence in the light favorable to the findings, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. *See OAIC,* 234 S.W.3d at 736. When reviewing a factual insufficiency challenge, we consider all of the evidence and determine whether the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *See Corrales v. Dep't. of Family & Protective Servs.,* 155 S.W.3d 478, 488–89 (Tex.App.-El Paso 2004, no pet.).

 The evidence relied upon by the Hesses to support the jury's verdict primarily relates to the potential impairment of the child's emotional development resulting from his removal from the Hesses' home. This focus on potential harm caused by the child's removal is misplaced. The proper focus of the court's inquiry is solely upon whether the placement of the child with the natural parent would significantly impair the child's physical health or

emotional development. *See Lewelling,* 796 S.W.2d at 166.

The Hesses rely heavily upon the case of *In re Rodriguez* to support their position that the effect of removing the child from their care must be considered. *See In re Rodriguez,* 940 S.W.2d 265 (Tex.App.-San Antonio 1997, writ denied). In *Rodriguez,* the court affirmed the trial court's order appointing the adoptive parents as the child's managing conservators and appointing the child's natural father as her possessory conservator. In doing so, the court discussed the "undisputed expert testimony" establishing that the child's emotional development "will be impaired to some extent if she is removed from the [nonparent's] care." *Id.* at 273. This evidence included testimony that, after two visits with her natural father, the child would refuse to go to sleep and woke in the middle of the night screaming. Also following the visits, the child would cry if her adoptive parents left the room.

 First, to the extent *Rodriguez* can be read to hold that the negative effect on the child caused by his separation from the nonparents may, standing alone, be sufficient to deny a natural parent managing conservatorship, we decline to follow it. A natural parent has a fundamental liberty interest in the care, custody, and management of his child. *See Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This right cannot be infringed absent evidence that such care, custody, and management by the natural parent would result in physical or emotional harm to the child. *See Lewelling,* 796 S.W.2d at 167.

Secondly, the facts of this case are readily distinguishable from those in *Rodriguez.* Unlike the child at issue in *Rodriguez,* there is no evidence that the boy in this case suffered any ill effects from time spent with his father. To the contrary, a clinical social worker who observed Shawn interacting with his son on several occasions testified that the boy seemed very happy in Shawn's care. The social worker stated Shawn was "interactive with the child in a way that was meaningful to the child." The boy "played freely and explored in his dad's presence" and he was "laughing," "smiling," and "coming to his dad for help." Sabra Hess testified she had no concerns about Shawn caring for the boy and that their visits went very well.

Finally, all of the evidence the Hesses presented about the negative effect on the child resulting from his separation from them was theoretical in nature. The Hesses testified that they believed the boy would be significantly impaired if he was taken from them, but they presented no specific evidence to support this belief. Statements by Sidwell and Larsen to the same effect were equally unsupported. The Hesses presented the expert testimony of Dr. Beth Bontempo, a psychologist, who was hired by them to conduct a "bonding and attachment assessment." Dr. Bontempo stated that she could "hypothesize based on attachment theory" that the child at issue would experience a breach of trust, broken attachment, and a sense of abandonment. Dr. Bontempo further stated, however, that it was "hard to know specifically for this child because we can't really know what his experience is going to be." A mere potential threat, as opposed to evidence of actual harm to the child's emotional development, is insufficient to deny a natural father the right to raise his own son. *See De La Pena,* 999 S.W.2d at 532–33.

The Hesses contend that Shawn was not diligent in pursuing his paternity claim, which allowed the child to reside with them for a lengthy period of time and form a strong attachment. The Hesses argue

this conduct should prevent Shawn from removing the child from the only home he has ever known. Although there is some dispute about when Shawn first became aware that he was the child's potential father and whether he initially supported the adoption plan, the evidence is undisputed that he timely filed his notice of intent to claim paternity with the state registry after the child was born. The evidence is also undisputed that, in the months following the child's birth, Shawn contacted several lawyers, wrote a letter to the governor's office, and contacted the FBI and a father's rights group in an attempt to determine how to assert his rights. Although it took time for the case to be brought to trial, Shawn did nothing during that time period that would demonstrate an intent to abandon his parental rights to his son. Even more importantly, it is undisputed that LDS allowed the Hesses to obtain custody of the baby and remove him from the state with full knowledge that the natural father had not relinquished his rights and there was a risk the child would need to be returned to him.

 The Hesses next attempt to show that Shawn's past behavior indicates that granting him managing conservatorship of the child would significantly impair the boy's physical health or emotional development. Although an adult's future conduct may be somewhat determined by recent past conduct, past misconduct may not be sufficient, in and of itself, to show present unfitness to be a parent. *Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex.App.-Houston [1st Dist.] 2007, no pet.). Certain past acts or omissions such as physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior may indicate a threat of future harm to a child. *See De La Pena*, 999 S.W.2d at 528. Custody disputes are inherently fact intensive, however, and we must evaluate each case on an individual basis. *Id.* at 529. When a nonparent and a parent are both seeking managing conservatorship, the "close calls" go to the parent. *See Whitworth*, 222 S.W.3d at 623.

The Hesses contend that Shawn has a history of being physically abusive. Samantha testified there were three different incidents of "domestic violence" involving Shawn during the two-year period she lived with him. The first incident occurred approximately one year into their relationship. Samantha testified they had a fight that escalated into each of them pushing and shoving the other. Samantha stated that she slapped Shawn and he punched her in the shoulder. When asked if she was injured, Samantha replied, "Not bad. He just hit my arm." Samantha did not seek any medical attention following the incident.

On the next occasion, Samantha and Shawn were outside arguing and Samantha was yelling. According to Samantha, Shawn picked up a rock off the driveway and threw it at her leg. The rock hit her leg causing it to bleed "a little bit." Again, Samantha did not seek medical attention.

Samantha testified that the final occasion took place when Samantha and Shawn were in the car with Kaylee. Samantha stated Shawn hit her in the face and his finger scratched her eye causing "permanent damage." Following the incident, Razo took Samantha to the hospital. Razo testified that, when she asked Samantha how she injured her eye, Samantha told her she hit it on the door to the hot water heater in their trailer. Razo further testified she never saw any indication of any physical altercations between Shawn and Samantha. Shawn denied hitting Samantha and stated he had no idea Samantha had an eye injury, though he once took her

to a doctor because she was complaining about her eye.

In addition to these incidents, Samantha testified that Shawn essentially forced her to have sex with him one time after she had moved out. Samantha stated she went back to his place to get her things and, because she was moving her belongings out, "there was just a lot of convincing on it." According to Samantha, Shawn indicated she needed to have sex with him to get her things back.

Despite this testimony, Samantha testified she did not think Shawn posed any danger to either of their children. Indeed, Samantha allowed Shawn to spend more time with Kaylee than the court order on custody of Kaylee required. When asked why she thought custody of their son should not be awarded to Shawn, Samantha stated she thought Shawn did not do enough with his kids and was unreliable in paying child support. There is no evidence that Shawn ever harmed one of the children or was in any way inappropriately physical with them or with anyone other than Samantha.

Dr. Linda Threats, a clinical social worker, who specializes in child custody evaluations, testified that based upon her observations of Shawn and his son together, Shawn appeared to be fair-minded, gentle, stable, and appropriate in terms of discipline. Dr. Threats further opined that, although Shawn was anxious at times, he did not have any type of personality disorder. Threats stated Shawn was genuinely interested in being a parent to his son and that he takes commitment seriously.

Debra George, a neighbor of Shawn's parents and a parenting skills teacher, testified she had observed Shawn interacting with Kaylee. According to George, Shawn appeared to have a good relationship with Kaylee and she followed him everywhere. George never saw anything about Shawn's relationship with Kaylee that caused her concern. She stated Shawn "does great" in his frequent interactions with the foster children in her care. Most of George's clients at her parenting classes are ordered to be there by child protective services. But Shawn voluntarily chose to attend her parenting classes and paid for them.

Linda McDonald, a social worker who specializes in home studies and approving foster homes, testified she evaluated Shawn's parenting skills and his ability to provide a secure and safe home for his children. McDonald testified Shawn and Kaylee had a very loving and nurturing relationship and they were very bonded to each other. She observed that Shawn was patient and kind with Kaylee and stated he even stopped the home study at one point so he could go outside and be with her because she wanted his attention. She believed Shawn had good parenting skills and that he had shown he could meet the needs of a child financially and emotionally. McDonald had no concerns that Shawn would pose any threat of significant impairment to a child's physical health or emotional development.

As stated above, it is the nonparent's burden to show by a preponderance of the evidence that appointing the parent as managing conservator would significantly impair the child's physical health or emotional development. In this case, the evidence preponderates strongly in favor of Shawn's ability to safely and securely raise his son. All of the testifying experts agreed that Shawn was attentive to the needs of his children and provided a safe and loving environment. Even Samantha and Sabra testified that they had no concerns for the child's safety in Shawn's care.

The only evidence counteracting this is Samantha's testimony about three incidents in which Shawn apparently hurt her physically and one incident in which he required her to have sex with him in order to get her things back from his residence. Viewing this testimony in the light most favorable to the verdict, as we must, we are compelled to conclude that it amounts to more than a scintilla of evidence to support awarding managing conservatorship to the Hesses. We further conclude, however, that this testimony is greatly outweighed by the evidence showing that awarding managing conservatorship to Shawn poses no threat to his son's physical or emotional well-being. The evidence shows that Shawn has struggled to assert his right to be a father to his son and that he is capable of forming a loving and supportive bond with his child. To deny him this parental right, in favor of a nonparent, based solely on testimony of alleged incidents that took place in one past relationship, which the record before us reveals was characterized by inappropriate behavior on both sides, would both shock the conscience and be manifestly unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986).

In reaching this conclusion, we recognize the important balance that must be struck between the best interest of a child and a parent's constitutional right to care for his child. The rights of a natural parent have been characterized as essential and far more precious than any property right. *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985). But parental rights are not absolute, and the physical and emotional well-being of the child must not be sacrificed to preserve those rights. *See In re C.H.*, 89 S.W.3d 17, 26 (Tex.2002). With these important interests and the standard to be applied in mind, we have reviewed the record as a whole and hold that the evidence is factually insufficient to support

a finding that awarding Shawn managing conservatorship of his son would significantly impair the child's physical health or emotional development.

Finally, the Hesses appear to argue that Shawn should not be awarded managing conservatorship of his son because he has a history of failing to support both the child at issue and his other children. Before Shawn and Samantha had Kaylee, Shawn fathered a son with a previous girlfriend. Shawn acknowledged he missed some of his child support payments for that child but stated that the lapse was due to his suffering a work-related accident. After a long and expensive custody battle over the child, Shawn ultimately relinquished his parental rights, and the child was adopted by his maternal grandparents.

Shawn also conceded that he missed some of the required child support payments for Kaylee, but the evidence showed he had provided financial assistance in the past and, at the time of trial, he was paying child support through deductions from his paycheck. Although Shawn failed to visit with Kaylee for a lengthy period of time after she and Samantha moved in with Darrell, Shawn stated it was because Darrell threatened Shawn to stay away from them.

As for the child involved here, Samantha suggests that, despite the fact she never discussed the pregnancy with Shawn, he should have known he was potentially the father and offered to provide her with financial assistance. Shawn did not pay for any of the medical expenses during Samantha's pregnancy, but when he was eventually given the Hesses's address, he began sending them money to help support the child.

Although this testimony may show that Shawn is not a perfect parent, it provides

no evidence that appointing Shawn as managing conservator of his son would significantly impair the child's physical health or emotional development. Although there may be many reasons that appointing Shawn as managing conservator rather than the Hesses might not be in the child's best interest, the only reason sufficient to rebut the parental presumption is a threat to the child's physical or emotional safety. *See Lewelling,* 796 S.W.2d at 166.

After reviewing the record as a whole, we conclude the Hesses failed to meet their burden to rebut the parental presumption. The evidence is factually insufficient to support the trial court's order to the extent it awards managing conservatorship of B.B.M. to the Hesses. Accordingly, we reverse the trial court's order in part and remand the issue of managing conservatorship of B.B.M. for a new trial. The portions of the order addressing the termination of parental rights to B.B.M. are affirmed.