**AFFIRM; and Opinion Filed November 9, 2023**



In The
**Court of Appeals
Fifth District of Texas at Dallas**

**No. 05-23-00536-CV**

**IN THE INTEREST OF A.S. AND D.S., CHILDREN**

**On Appeal from the 305th Judicial District Court
Dallas County, Texas
Trial Court Cause No. JC-21-1143-X**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Garcia, and Kennedy
Opinion by Justice Kennedy

Mother appeals an order terminating her parental rights to child D.S. and appointing her possessory conservator of child A.S. In her first issue, she challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her rights as to D.S. is in the child's best interest. In her second issue, she contends the trial court abused its discretion by appointing a non-parent managing conservator of A.S. We affirm. Because all dispositive issues are settled in law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.2(a), 47.4.

### FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father met in Louisiana and were in a relationship for a few years, during which time they moved to Texas and had two children, A.S. and D.S. The

family lived with Father's mother ("Paternal Grandmother"), Paternal Grandmother's husband, Father's brother, and Paternal Grandmother's godson. Mother worked at Walmart from 6:00 a.m. to 3 p.m. while Father cared for the children, and Father worked at Cici's Pizza from 4 p.m. until 10 p.m. while Mother cared for the children.

On the morning of December 4, 2021, at about 5:00 a.m., Mother went to work, leaving seven-week-old D.S. and 14-month-old A.S. in the care of Father, who was still asleep. At about 11:30 a.m., Father began sending messages to Mother that something was wrong with D.S. and to call him. Mother finished checking out the customers in her line and stepped away from her cash register to call Father. When he did not answer, she left work immediately to drive home. On the way home, she was able to video call Father, who showed her D.S. Mother thought D.S. looked like he was having a seizure and instructed Father to call 9-1-1. When Mother arrived home, emergency medical personnel were examining D.S., but they declined to transport D.S. to a medical facility. Mother and Father drove D.S. to the hospital where he was examined and admitted to the neonatal intensive care unit.

That evening, CPS[1] Special Investigator Megan Wash, went to the hospital with the understanding that "there was a child, one-month-old, with severe head injury." Wash spoke to the social worker and medical staff familiar with D.S.'s case

---

[1] The Texas Department of Family and Protective Services initiated the underlying case and will be referred to throughout this opinion as either "CPS" or "the Department."

before speaking to the parents individually. Mother told Wash she did not know what had happened to D.S. and wanted to know what could have happened. Wash went to the family's home and spoke to Father who stated that he had woken up at 7 a.m., put on a show for A.S., went downstairs to smoke a cigarette for about twenty minutes, and returned to find D.S. on the floor. Father indicated that D.S. had either rolled off of the bed or had been caused to fall off of the bed by 14-month-old A.S. Father stated that sometime between 10 a.m. and 11 a.m., he told Paternal Grandmother that D.S. was "acting funny." After talking with both parents and the nurses, Wash determined Father's explanation that D.S. fell off of the bed could not have caused his injuries. She further determined that a safety plan was necessary for A.S. because she suspected that Father was responsible for D.S.'s injuries and Mother was going to stay at the hospital with D.S. Mother named one of Father's relatives, Paternal Cousin, to care for A.S. A.S. remained in the care of Paternal Cousin, while D.S. was eventually discharged from the hospital into the care of foster parents in Houston.

On December 5, Dr. Kristen Reeder, a child abuse pediatrician with the REACH Clinic at Children's Medical Center, performed a medical evaluation on D.S. Upon examination, Dr. Reeder discovered that D.S. had a skull fracture on the right side of his head that had separated, bleeding around both sides of his brain, multiple areas of brain swelling, and one area of brain tissue damage. He also had two bone fractures on his lower leg and metaphyseal corner fractures near his ankle,

–3–

which had been discovered after D.S.'s initial x-rays on the day he was admitted. The injuries to his leg were already in the healing state, indicating that they happened at least a week prior. Mother and Father both reported that, the previous day, D.S. had slept all day and had to be woken up to be fed, which Dr. Reeder noted was unusual for a child. To explain D.S.'s head injuries, Father informed Dr. Reeder that D.S. had fallen off the bed, but Dr. Reeder testified that, although it was feasible for a child to fall from the bed, such a fall would not cause the severity of D.S.'s injuries. Father offered no explanation for the injuries to D.S.'s leg. Dr. Reeder testified that the metaphyseal fractures indicated at the ends of the bone and are referred to as "'highly specific for inflicted injury' because especially in a little infant they are . . . caused by a violent pulling or yanking on the bone." She further stated that the presence of these fractures, at D.S.'s age of seven weeks, were odd "unless [they] were] inflicted [on] him."

Detective Timothy Roundtree with the Mesquite Police Department interviewed both Mother and Father about D.S.'s injuries. Mother reported simply that she had left D.S. in Father's care while she worked, Father contacted her about D.S.'s acting differently, and she told Father to call 9-1-1 to get medical treatment for D.S. The detective confronted Father with the fact that the version of events he had given previously—D.S. falling off the bed—did not explain the extent of D.S.'s injuries. Father admitted he had been holding D.S. in his lap while playing a video game. When he began losing, Father became extremely mad and stood up, causing

D.S. to fall. Father caught D.S. by the ankle, causing the newborn to swing and hit his head against the bedframe. Father also admitted to forcefully shoving a pacifier into D.S.'s mouth because the newborn was crying. The detective testified Father was later charged with one count of serious bodily injury to a child.

On December 7, the Department[2] filed an original petition for protection of a child, for conservatorship, and for termination in suit affecting the parent–child relationship. In its original petition, the Department stated its intent to reunify Mother and Father with the children but alternatively sought to terminate their parental rights on the grounds they knowingly placed or allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being[3] and engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being.[4]

The case proceeded to a bench trial, which took place on December 10, 2022, and continued on January 10, February 6, February 7, February 15, and February 17 of 2023. The Department called several witnesses to testify, including Dr. Reeder, Detective Roundtree, Special Investigator Wash, and Betty Cannon, a therapist

---

[2] *See supra* note 1.

[3] *See* TEX. FAM. CODE § 161.001(b)(1)(D).

[4] *See* FAM. § 161.001(b)(1)(E).

whom Mother had been ordered to visit. Paternal Grandmother testified on behalf of Father, and Mother's only witness was herself.

After considering the evidence and arguments of counsel, the trial court terminated the parent–child relationship between Father and both children based on findings that Father had knowingly placed or allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being[5]; that Father engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being[6]; and that termination of the relationship was in the children's best interest. The trial court further terminated the parent–child relationship between Mother and D.S. based on findings that Mother had knowingly placed or allowed D.S. to remain in conditions or surroundings that endangered D.S.'s physical or emotional well-being[7] and that termination of the relationship was in D.S.'s best interest.[8]

The trial court appointed the Department as permanent managing conservator of D.S. Finally, the trial court appointed Paternal Cousin as managing conservator of A.S. and Mother as possessory conservator A.S., after finding appointment of Mother as permanent managing conservator of A.S. would significantly impair the

---

[5] *See* FAM. § 161.001(b)(1)(D).

[6] *See* FAM. § 161.001(b)(1)(E).

[7] *See* FAM. § 161.001(b)(1)(D).

[8] *See* Fam. § 161.001(b)(2).

physical health or emotional development of A.S. and that Mother requires assistance and guidance in making decisions regarding the welfare of A.S.

Mother filed her notice of appeal. Father did not file a notice of appeal.

## DISCUSSION

## I. Termination of the Parent–Child Relationship with D.S.

In her first issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her rights as to D.S. is in the child's best interest.[9]

A court may terminate a parental relationship if it finds by clear and convincing evidence (1) one or more statutory grounds for termination and (2) that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2). Clear and convincing evidence is proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* § 101.007.

In reviewing the legal sufficiency of the evidence supporting an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a "firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "To give appropriate deference to the factfinder's conclusions and the role

---

[9] Although Mother cites both sections 161.001(2) and 161.003(a)(5) of the family code, the Department did not seek, and the trial court did not grant termination under section 161.003. Therefore, we only address Mother's issue under section 161.001(2).

–7–

of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* In other words, we will disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

In a factual sufficiency review, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

A strong presumption exists that the best interest of the child will be served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of a child in a safe environment is also presumed to be in the child's best interest. *See In re K.S.L.*, 538 S.W.3d 107, 115 (Tex. 2017) (citing FAM. § 263.307(a)). Several statutory factors relevant to this appeal should be taken into account in evaluating a parent's willingness and ability to provide the child with a safe environment, including the child's age and vulnerabilities; results of psychological evaluations of the parents; whether there is a history of substance abuse by the child's family; the willingness and ability of the child's family to complete counseling services and to cooperate with an agency's

close supervision; and the willingness and ability of the child's family to effect positive and personal changes within a reasonable period of time. *See In re S.B.*, No. 05-20-01066-CV, 2021 WL 1940453, at *3 (Tex. App.—Dallas May 14, 2021, no pet.) (mem. op.) (citing FAM. § 263.307(b)(1), (6), (8), (10), (11)).

In addition to these statutory factors, we look to other non-exclusive factors relevant to the best-interest determination, including (1) the child's desires, (2) the child's present and future emotional and physical needs, (3) the present and future emotional and physical danger to the child, (4) the parent's parental abilities, (5) the programs available to assist a parent to promote the child's best interest, (6) the parent's plans for the child, (7) the stability of the home, (8) the parent's acts or omissions that may indicate the parent–child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (citing FAM. § 263.307; *Holley*, 544 S.W.2d at 371–72). A best-interest finding need not be supported by evidence of every *Holley* factor, particularly if there is undisputed evidence that the parental relationship endangered the child's safety. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

### A. D.S.'s Desires

The trial court heard evidence that D.S. was approximately 14 months' old at the time of trial. Further, the injuries D.S. sustained caused him to have significant developmental delays such that he cannot speak or walk and has cortical blindness

–9–

so that he can only see shadows or movement. Therefore, due to his age and injuries, D.S. was not able to express his desires. *See In re C.V. L.*, 591 S.W.3d 734, 754 (Tex. App.—Dallas 2019, pet. denied) (noting first *Holley* factor of child's desires "is generally considered neutral" when child does not testify due to young age). The court heard testimony from Paternal Grandmother and Mother regarding the sole in-person visit Mother had with D.S. at his foster home. According to Paternal Grandmother, Mother held D.S. and he was smiling. Mother related that when she held and talked to him, D.S. "was smiling and it's like he knew I was his mom." However, we have previously held that "evidence that a child loves a parent and enjoys visits is only marginally relevant to a best interest finding." *See In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied). Accordingly, we conclude on the record of this case that this factor is neutral, weighing neither in favor of nor against termination of parental rights.

### B. D.S.'s Physical and Emotional Needs

Witnesses testified extensively as to D.S.'s physical needs, and there was little evidence as to his emotional needs. Debbie Guedry, a CASA supervisor, testified she had worked with CASA for over seven years on over sixty cases and had not had "as medically fragile of a case as [D.S.'s]." As previously noted, D.S.'s injuries resulted in significant developmental delays, causing him to be unable to speak or walk or see much more than shadows. At the time of trial, D.S. required nursing care 24 hours each day and a feeding tube. During his days and nights, D.S. lay on

–10–

a medical crib that is elevated as he had difficulty sitting up without assistance and required several different exercises to stretch his muscles as well as glasses to help him see better. At the time of trial, D.S. had a total of nine different physicians, all of whom were located in the Houston area. According to Guedry, she had attended conferences with D.S.'s medical providers and testified as to her opinion that it would not be in D.S.'s best interest to move to a different location with different providers. There was also evidence that D.S.'s condition would not improve but instead that his physical needs would grow as he grew larger and remain unable to speak or walk or feed himself. According to Dr. Reeder, D.S. "will have a low quality of life, will require . . . significant medical care . . . for the rest of his shortened life."

As for D.S.'s emotional needs, Angeline Wolf, the CPS caseworker who had been assigned to this case since December 2021, testified D.S.'s foster mother in Houston wanted to adopt D.S. Guedry testified that foster mother had been "very good" with D.S. and that she had observed the foster mother be very interactive with D.S. Mother testified she would love D.S. the same way his foster mom would. In light of this record that shows D.S.'s extensive physical needs as well as the fact that D.S.'s head injuries and broken bones were sustained before his removal from Mother's custody, we conclude this factor is related to the remaining *Holley* factors below. *See, e.g.*, *In re D.W.*, 445 S.W.3d at 926 (noting second and fourth *Holley*

–11–

factors are related). Accordingly, we will weigh these factors together at the conclusion of this section of the opinion.

### C. Present and Future Emotional and Physical Danger to D.S.

The record evidence indicated D.S. faced physical danger from his injuries, more specifically any cessation or change in his care. As discussed above, D.S.'s medical needs were extensive at the time of trial and were anticipated to become only more so with time as he grew larger with age. The trial judge heard testimony that while D.S. remained in the hospital in Dallas, his name had been removed from the Department's petition because "they were not expecting him to live." Guedry testified as to her belief that it was due to D.S.'s medical providers and his foster mother that he was still alive at the time of trial. Several witnesses, including the therapist CPS required Mother to see, expressed concern that Mother did not understand the full extent, the severity, or the permanence of D.S.'s injuries. The concern underlying much of this testimony was that Mother had moved to Shreveport, and Wolf testified she did not know what resources or providers were available to Mother or D.S. in that city. Mother did not offer any testimony regarding what resources or providers were available in Shreveport, only that she had made plans and attempted to reach out to governmental agencies, like Medicaid and CPS.

In addition to the physical danger to D.S. in the event of inadequate care for his injuries, there was the evidence that D.S. had suffered those life-threatening

injuries while in Father's care and that he had suffered other injuries of fractured bones while in Mother's and Father's custody. Dr. Reeder testified that the fractured bones D.S. suffered are referred to as "'highly specific for inflicted injury' because especially in a little infant they are . . . caused by a violent pulling or yanking on the bone" and that they appeared to have been sustained a week prior to D.S.'s head injury. No explanation was provided by Father or Mother for those injuries. The record contained some evidence that there were times between the time Father left for work and the time Mother returned home that the children were left without care from any particular adult living at the home. There was also evidence that Father had been adjudicated for the sexual assault of his five-year-old cousin when he was sixteen years old. Thus, the record contains evidence of risk for physical danger to D.S. from abuse while in Mother's care, if only from others whom she might trust to care for D.S. as she did Father and the other adults living with her and the children. *See* FAM. § 263.307(b)(8) (courts may consider whether there is history abusive or assaultive conduct by the child's family or others who have access to the child's home in determining whether child's parents are willing and able to provide child with safe environment); *see, e.g.*, *In re C.J.P.*, No. 05-22-00233-CV, 2022 WL 7936574, at *10 (Tex. App.—Dallas Oct. 14, 2022, pet. denied) (mem. op.) (concluding evidence of Mother's neglect, physical abuse, and failure to intervene to stop Father's abuse of children weighed in favor of terminating parental rights in discussion of third *Holley* factor).

As for emotional danger, several witnesses testified as to their concern that Mother did not understand the criminal nature of Father's actions that resulted in D.S.'s injuries and that Mother would permit Father to visit or otherwise contact D.S. CASA advocate Nancy Cherwitz testified that when she met with Mother and Wolf in August 2022, it appeared to her that Mother did not think Father had done anything wrong, with respect to causing D.S.'s injuries, and that Mother did not understand why Father was not allowed to see D.S. or A.S. Wolf, the CPS caseworker, similarly testified that Mother told Wolf that she did not believe Father intentionally injured D.S.

Mother testified that Father should have his parental rights to both children terminated, and she expressed her understanding that Father needed to be kept away from A.S. because of what D.S. "had went through, it was very serious." She also admitted that she told her therapist that she wanted her children to have their Father around. Mother testified she meant she would allow him to have video calls with A.S. and D.S. Mother explained her understanding that, because Father had been charged with injury to a child, he could not leave the state of Texas to visit Mother where she lived in Shreveport and could not "harm the kids on the video visit." *See In re C.J.P.*, 2022 WL 7936574, at *12 (concluding evidence of Mother's demonstrated inability to protect her children from the emotional and physical dangers of domestic violence could support trial court's conclusion that children had and would continue to be subject to emotional and physical danger).

–14–

*D. Mother's Parental Abilities*

Witnesses testified as to three main concerns with regards to Mother's parental abilities. First, as noted above, Cherwitz and Wolf testified they did not believe Mother understood the criminal nature of Father's actions that caused D.S.'s injuries and thus would not protect D.S. from future contact with or other potential harm from Father. As discussed above, Mother testified her belief that D.S.'s head injuries were the result of an accident, not caused by any intentional conduct by Father and that she did not see any harm in continuing to allow him to contact both children with video calls.

Second, several witnesses, including Betty Cannon, the therapist CPS required Mother to see between twenty-five and thirty times, expressed concern that Mother did not understand the full extent, the severity, or the permanence of D.S.'s injuries and thus would not be prepared to care for him. Cannon testified that when she discussed D.S.'s future care and physical needs as he grew older, including that he would need "someone to change him on a daily basis, feed him, pick him up, [and] carry him everywhere," Mother told her, "no, I'm not accepting that from my child." According to Cannon, Mother said she had seen D.S. making developmental progress at a level appropriate for his age and even at a level appropriate for an older infant and that Mother did not believe the medical reports and did not understand that his injuries were permanent. Cannon admitted it was not unreasonable for Mother to question the accuracy of the medical reports, but Cannon also "felt as

though [Mother] was not fully comprehending . . . how [caring with a child with developmental delays] would change her lifestyle."

The third concern raised, particularly by Cannon, was that Mother was easily influenced and lacked good decision-making abilities. Cannon related that Mother would rely on the advice of others to make decisions, even what furniture and furnishings to include in her home. According to Cannon, Mother was aware that Father was abusing marijuana on a regular basis to relieve stress and did not believe it would affect his ability to take care of the children while Mother was at work. *See* FAM. § 263.307(b)(8) (courts may consider whether there is history of substance abuse by child's family in determining whether child's parents are willing and able to provide child with safe environment); *see also In re L.E.H.*, No. 05-18-00903-CV, 2018 WL 6839565, at *6 (Tex. App.—Dallas Dec. 31, 2018, no pet.) (mem. op.) (considering Father's awareness of Mother's history of substance abuse as evidence in support of trial court's best-interest finding)). Cannon testified Mother needed oversight when parenting A.S. and that she was not capable of parenting D.S., even with oversight. Cannon testified one of the areas she worked on with Mother was parenting skills and had observed Mother applying those skills with A.S., but Cannon still concluded "that the only thing [Mother] needed was somebody to kind of help her oversee some of the higher functioning skills of parenting with her child."

Mother offered evidence of completing services assigned to her by CPS, disputed Cannon's assessment, and offered evidence of the parenting certificate she had received. Mother testified that she had contacted Medicaid and the CPS agency in Shreveport about resources to care for D.S. and that she planned to have her mother care for D.S., as well as receive training herself. Cannon testified that she had observed at least one visit between Mother and A.S. and that the parent–child dynamic between them appeared healthy.

### E. Programs Available to Assist Mother

There was limited evidence regarding what programs were available to assist Mother. Wolf testified she did not know of what resources were available to Mother in Shreveport. Mother testified she had contacted Medicaid and CPS in Shreveport. According to Mother, Medicaid told her D.S.'s medical records in Houston were necessary "to see how they can get me some type of assistance for his—for the nursing that he has there." Mother also testified that CPS in Shreveport told her it would help get her training to care for D.S. and that it would help her obtain benefits through Medicaid.

### F. Mother's Plans for D.S.

Even after the trial court heard testimony that D.S. required nursing care twenty-four hours a day, a feeding tube through his navel, several daily stretching exercises, and care from nine physicians, Mother did not testify as to any more specific plan for caring for D.S. other than that she had contacted Medicaid and CPS

–17–

in Shreveport and that her mother, Maternal Grandmother, would help her care for A.S. and D.S. if both were returned to her. There was some evidence that Maternal Grandmother had some training or certification as a nursing assistant. Mother admitted that she did not contact Medicaid in Shreveport until January 2023, after the first trial hearing, despite the fact that she had moved to Shreveport in September 2022. Mother stated her plan was to quit her job if D.S. was placed with her and that Maternal Grandmother would help her with rent and other expenses.

*G. Stability of Mother's Home*

The record reflects that when D.S. was first injured and A.S. was removed from Mother's care in December 2021, Mother lived in Paternal Grandmother's home with Father and other paternal relatives. Mother testified that two days after D.S.'s injury, she moved into her own apartment away from the "drama" at Paternal Grandmother's home. Around August 2022, Mother decided to move to Shreveport and did so in September 2022.[10] According to Mother, she lived in an apartment in Shreveport within minutes of Maternal Grandmother and at least one maternal aunt. Mother offered pictures of the one-bedroom studio apartment she was renting and testified she had lived there since early October 2022. Mother also testified that she

_____

[10] There was conflicting evidence as to whether the CPS caseworker encouraged Mother to move to Shreveport. The CPS caseworker denied that she had done so and instead testified that Mother informed her that she needed to move to Shreveport because she had lost her job and had been evicted from her apartment for failure to pay her rent. Mother testified she had never been evicted nor had she told anyone at CPS that she was evicted. According to Mother, she applied for and obtained a hardship transfer to obtain a job at a Walmart in Shreveport and then moved to an apartment there with the help of her mother and her aunt.

had applied for and obtained a transfer from her job with Walmart in Dallas to a Walmart in Shreveport. Mother stated her plan was to quit her job if D.S. was placed with her and that Maternal Grandmother would help her with rent and other expenses.

### H. Mother's Acts and Omissions and Excuses for Same

The evidence in the record consistently established that Mother was not at home when D.S. began seizing. Further, there was evidence that Father admitted to causing head injury to D.S.—while Mother was at work—by standing from a seated position while holding the infant in his lap, catching the infant's ankle, and—whether intentionally or not—causing D.S.'s head to hit the bedframe. However, there was also evidence that D.S. had healing bone fractures that Dr. Reeder testified were likely caused by pulling or yanking on D.S.'s legs, and there was evidence that on December 3, 2021, Mother and Father had to wake D.S. to feed him and that he had some amount of redness or swelling over one of his eyes. Neither Mother nor Father offered any explanation for the cause of D.S.'s healing bone fractures. Therefore, the trial court could found that even if Mother did not harm D.S. herself, she left him in the care of Father who admitted to harming D.S.

Moreover, there was evidence that Mother was aware that Father regularly used marijuana, and Mother testified—even after Cannon testified as to explaining to Mother the danger of leaving Father alone to care for young children while under the influence of marijuana—that she thought it was a good decision to leave her

children with Father at 5 a.m. in the morning, knowing that he had smoked marijuana before going to bed around midnight. According to Cannon, she believed that Mother's conduct indirectly resulted in D.S.'s injuries because she was aware of Father's drug use and did not think it would have any great effect on his ability to take care of their children. Mother's only explanation for her lack of concern about Father's drug use was that she did not think Father acted any differently when he was under the influence of marijuana.

### I. Summary of Facts and Conclusion

As noted above, the concerns about D.S.'s current and future physical and emotional needs, the physical and emotional danger he continued to face and Mother's parenting abilities are all related. D.S. was particularly vulnerable due to his injuries and age at the time of trial. *See* FAM. § 263.307(b)(1) (child's age and physical vulnerabilities). There was evidence that Mother—even though she testified she understood that D.S. required nursing care around the clock—had not made any efforts to prepare for that care, outside of contacting CPS in Shreveport and Medicaid and obtaining her own mother's agreement to assist her with D.S.'s care. There was repeated testimony that when presented with the opportunity to discuss D.S.'s medical care with his medical providers, Mother did not take those opportunities, instead she remained silent. *See id.* Further, there was evidence that Mother, although she testified she would limit Father's access to D.S., still believed the incident that caused D.S.'s injuries was an accident, did not comprehend the

–20–

criminal nature of Father's conduct in causing D.S.'s injuries, and did not understand the inherent danger Father presented as someone who was abusing marijuana while caring for a newborn and a toddler barely older than a year. *See* FAM. § 263.307(b)(6) (results of psychological and developmental evaluations of child and Mother), (7) (history of abusive conduct by child's family), (8) (history of substance of abuse), (10) (willingness of child's family to effect positive environmental and personal changes), (11), (12)(E) (protection from repeated exposure to violence), and (12)(F) (child's family's understanding of child's needs and capabilities). All of that evidence could cause the trial court judge to be concerned about Mother's ability to protect D.S. from future injuries.

Taking into account non-exclusive factors set forth in *Holley*, we conclude the record contains legally and factually sufficient evidence to support the trial court's finding that it was in D.S.'s best interest that Mother's parental rights to him be terminated. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

In support of her first issue, Mother asks why if D.S. would be in a "vegetative state" the remainder of his life should Mother's parental rights be terminated. This Court has previously held that the *Holley* factors focus on the best interest of the child, *not the best interest of the parent*. *See In re K.D.*, No. 05-18-00849-CV, 2018 WL 6187660, at *4 (Tex. App.—Dallas Nov. 27, 2018, pet. denied) (mem. op.) (emphasis added). Moreover, underlying this question is the presumption that D.S.

could suffer no further harm from contact with Mother. Based on the record and evidence in this case, we conclude the trial court could have found otherwise.

Mother's first issue is overruled.

## II. Conservatorship of A.S.

In her second issue, Mother argues the Department did not overcome the parental presumption and thus the trial court abused its discretion in naming Mother the possessory conservator instead of the managing conservator of A.S.

### A. Applicable Law and Standard of Review

In its final order ordering the appointment of Mother as possessory conservator of A.S., the trial court's made the finding that the appointment of Mother as managing conservator of A.S. "is not in the best interest of the child, because the appointment of [Mother] would significantly impair the physical health or emotional development of the child." That language tracks that of section 153.131 of the family code.

"It is a rebuttable presumption that the appointment of the parents of a child as joint managing conservators is in the best interest of the child." TEX. FAM. CODE § 153.131(b)). "[U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." Id. § 153.131(a). The strong presumption

–22–

that the best interest of a child is served by appointing a natural parent as managing conservator is deeply imbedded in Texas law. *See In re A.M.*, No. 05-19-00412-CV, 2019 WL 4071998, at *2 (Tex. App.—Dallas Aug. 29, 2019, no pet.) (mem. op.) (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990), *In re J.T.S.*, No. 05-17-00204-CV, 2018 WL 1465535, at *3 (Tex. App.—Dallas Mar. 26, 2018, no pet.) (mem. op.), and *In re B.B.M.*, 291 S.W.3d 463, 468 (Tex. App.—Dallas 2009, pet. denied)).

To support a finding of significant impairment, the evidence must do more than merely raise a suspicion or speculation of possible harm. *See In re A.M.*, 2019 WL 4071998, at *2 (citing *In re B.B.M.*, 291 S.W.3d at 467). Instead, the evidence must support the logical inference that some specific, identifiable behavior or conduct of the parent, demonstrated by specific acts or omissions, will probably harm the child. *Id.* (citing *In re B.B.M.*, 291 S.W.3d at 467; *R.H. v. D.A.*, No. 03-16-00442-CV, 2017 WL 875317, at *5 (Tex. App.—Austin Mar. 2, 2017, pet. dism'd) (mem. op.)). This is a heavy burden that is not satisfied by merely showing the nonparent would be a better choice as custodian of the child. *See id.* (citing *In re B.B.M.*, 291 S.W.3d at 467). Acts or omissions that constitute significant impairment include, but are not limited to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by the parent. *See id.* (citing *In re B.B.M.*, 291 S.W.3d at 469). A factfinder may infer the present fitness of the parent to be managing conservator from the parent's recent, deliberate past

misconduct. *See id.* (citing *R.H.*, 2017 WL 875317, at *5). But evidence of past misconduct, standing alone, may not be sufficient to show present unfitness. *See id.* (citing *R.H.*, 2017 WL 875317, at *5). "When a nonparent and a parent are both seeking managing conservatorship, the 'close calls' go to the parent." *See id.* (quoting *In re B.B.M.*, 291 S.W.3d at 469) (citing *In re F.E.N.*, No. 18-0439, 2019 WL 2667029, at *2 (Tex. Jun. 28, 2019) (per curiam)).

"[A] finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard." *See In re A.M.*, 2019 WL 4071998, at *3 (quoting *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007)). The heightened standards of proof and review for termination decisions do not apply. *See id.* (citing *In re J.A.J.*, 243 S.W.3d at 616). Instead, conservatorship determinations "are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable." *See id.* (quoting *In re J.A.J.*, 243 S.W.3d at 616) (citing *In re L.W.*, No. 02-16-00091-CV, 2016 WL 3960600, at *1 (Tex. App.—Fort Worth Jul. 21, 2016, no pet.) (mem. op.) ("A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable.").

Legal and factual sufficiency are not independent grounds of error in conservatorship cases but are relevant factors in determining whether an abuse of discretion occurred. *See In re A.M.*, 2019 WL 4071998, at *3 (citing *In re L.W.*,

2016 WL 3960600, at *2). To determine whether the trial court abused its discretion because the evidence was insufficient to support its decision, we consider whether (1) the trial court had sufficient evidence upon which to exercise its discretion and (2) erred in its exercise of that discretion. *Id.* (citing *In re L.W.*, 2016 WL 3960600, at *2). We conduct the applicable sufficiency review with regard to the first question. *Id.* (citing *In re L.W.*, 2016 WL 3960600, at *2). We then determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.* (citing *In re L.W.*, 2016 WL 3960600, at *2). The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See id.* (citing *In re M.A.M.*, 346 S.W.3d 10, 14 (Tex. App.—Dallas 2011, pet. denied)).

### B. The Trial Court Did Not Abuse Its Discretion By Not Appointing Mother as Managing Conservator of A.S.

Mother urges that the evidence in the record shows, at the time of trial, she was a presently suitable person to have custody of A.S. Mother points to the testimony from her therapist Cannon who stated Mother had maintained employment at Walmart, maintained a place to stay, and had obtained an appropriate size bed for A.S. in her apartment. Cannon also testified that the only thing she believed Mother needed was someone to help her oversee the higher functioning skills of parenting with her child. Mother also relies on the evidence that she had completed the services required of her by CPS and had family support from her own mother and aunt.

The evidence in the record contains more than what Mother relies on. The record also contains the evidence discussed above in analyzing the trial court's decision to terminate Mother's parental rights to D.S., including her refusal to acknowledge Father's conduct as criminal and her minimization of his drug use while caring for both D.S. and A.S. *See In re K.N.D.*, 424 S.W.3d 8, 10 (Tex. 2014) (per curiam) (holding that a reviewing court may examine a parent's history with other children as a factor of the risks or threats of the environment in context of examining whether child removed for abuse or neglect under chapter 262 of Texas Family Code).

Based on all the evidence in the record, we conclude the trial court had sufficient evidence upon which to exercise its discretion and did not err in appointing a non-parent managing conservator of A.S. *See In re A.M.*, 2019 WL 4071998, at *3 (citing *In re L.W.*, 2016 WL 3960600, at *2). Put another way, we cannot conclude the trial court acted arbitrarily or unreasonably by finding that the appointment of Mother as a managing conservator would significantly impair A.S.'s physical health or emotional well-being. *See* FAM. § 153.131(a).

We overrule Mother's second issue.

## CONCLUSION

We affirm the trial court's final order terminating Mother's parental rights to D.S. and appointing non-parent managing conservator of A.S.

/Nancy Kennedy/
NANCY KENNEDY
JUSTICE

230536F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF A.S. AND
D.S., CHILDREN,

No. 05-23-00536-CV

On Appeal from the 305th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. JC-21-1143-X.
Opinion delivered by Justice
Kennedy. Justices Pedersen, III and
Garcia participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's May 12, 2023 Final Order in Suit Affecting the Parent–Child Relationship.

It is **ORDERED** that appellee the TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES recover its costs of this appeal from SHATERRICA JOHNSON.

Judgment entered this 9th day of November 2023.